

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

|  |  |  |
|---|---|---|
| JEFFREY D. JORLING | ) | CASE NO. |
| 4163 Forest Avenue | ) | |
| Cincinnati, Ohio 45212, | ) | JUDGE |
| | ) | **1 : 09 cv- 0 7 9 8 WTL -TAB** |
| On Behalf of Himself and | ) | |
| All Others Similarly Situated, | ) | <u>**CLASS ACTION COMPLAINT**</u> |
| | ) | <u>**FOR MONEY DAMAGES AND**</u> |
| Plaintiffs, | ) | <u>**EQUITABLE RELIEF**</u> |
| | ) | |
| vs. | ) | (<u>Jury Demand Endorsed Hereon</u>) |
| | ) | |
| ANTHEM, INC. (n/k/a WELLPOINT, INC.) | ) | |
| 120 Monument Circle | ) | |
| Indianapolis, Indiana 46204, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ANTHEM INSURANCE COMPANIES, INC. | ) | |
| 120 Monument Circle | ) | |
| Indianapolis, Indiana 46204, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, Jeffrey D. Jorling ("Jorling"), on behalf of himself and a class of all others similarly-situated, for his Class Action Complaint seeking compensatory and punitive damages and equitable relief against Defendants, Anthem, Inc., now known as WellPoint, Inc. ("Anthem"), and Anthem Insurance Companies, Inc. ("Anthem Insurance") (Anthem and Anthem Insurance are sometimes collectively referred to herein as the "Anthem Defendants"), and each of them, jointly and severally, hereby claims, alleges, states and avers as follows:

## NATURE OF ACTION, JURISDICTION AND VENUE

1.     This is a class action brought under the Court's diversity jurisdiction as expanded by the Class Action Fairness Act of 2005 asserting state common law claims for (i) breaches of fiduciary duty, (ii) breaches of multiple contracts, and (iii) negligence, and seeking compensatory

and punitive damages as well as certain injunctive and other equitable relief.

2.    Jorling's claims and the claims of the unnamed class members he seeks to represent arise out of the 2001 conversion of Anthem Insurance, a mutual insurance company, into a stock corporation in a transaction known as a "demutualization." Jorling's claims and those of the unnamed class members are based upon Defendants' (i) failure to allocate sufficient Anthem shares to many of the mutual members of Anthem Insurance, and (ii) dilution of the mutual members' equity interests in Anthem and Anthem Insurance.

3.    This Court has diversity jurisdiction over the subject matter of the foregoing state law claims asserted in this action, pursuant to the provisions of 28 U.S.C. § 1332(d)(2), because the parties are citizens of diverse states and the amount in controversy, aggregating the claims of all class members, exceeds the sum of $5,000,000. The named Plaintiff is a citizen of Ohio, and the unnamed class members are citizens of Ohio, Indiana, Kentucky and Connecticut. Defendants are citizens of Indiana for purposes of 28 U.S.C. § 1332(c)(1). Thus, the named Plaintiff (and one or more of the unnamed class members) is a citizen of a state different from either of the Defendants.

4.    This Court also has supplemental jurisdiction, pursuant to the provisions of 28 U.S.C. § 1367(a), over any claims that are so related to the claims asserted under the Court's federal diversity jurisdiction that they form part of the same case or controversy within the meaning of Article III of the Constitution of the United States.

5.    Venue over the foregoing diversity claims is properly laid within the Southern District of Indiana, pursuant to 28 U.S.C. § 1391(a)(1), because all Defendants reside for venue purposes in Indiana, and at least one Defendant resides for venue purposes, within the meaning of 28 U.S.C. § 1391(c), in this judicial district.

## THE PARTIES

6.    Jorling is an individual residing at 4163 Forest Avenue, Cincinnati, Ohio 45212.

2

7.     Anthem is a corporation organized under the laws of the State of Indiana and has its principal place of business in Indianapolis, Indiana.  Anthem (now known as WellPoint, Inc.) is the parent company of Anthem Insurance.

8.     Anthem Insurance is a corporation organized under the laws of the State of Indiana and has its principal place of business in Indianapolis, Indiana.  Anthem Insurance was formerly known as Associated Insurance Companies, Inc. ("Associated"), and is a wholly-owned subsidiary of Anthem.

## CLASS DEFINITION

9.     The members of the Class consist of all former mutual members of Anthem Insurance who received shares of Anthem common stock as compensation for the extinguishment of their mutual membership interests in connection with the demutualization of Anthem Insurance, and the communities comprised of them and their spouses, if any, but excluding:

(i)     Anthem and Anthem Insurance, and each of them, and their respective successors and assigns;

(ii)    the executive officers and directors of Anthem and Anthem Insurance, together with their predecessors and successors, and their respective parents, spouses and children;

(iii)   all group contract holders of Anthem Insurance (usually employers and sometimes referred to as the "Grandfathered Groups");

(iv)    those former mutual members who received only the fixed component (set at 21 shares) of the demutualization compensation;

(v)     counsel of record in this action and their respective parents, spouses and children; and

(vi)    any judicial officer who enters an order in this action, and their respective

3

parents, spouses and children.

## CLASS ACTION ALLEGATIONS

10.     The named Plaintiff and the members of the Class he seeks to represent are all former mutual members of Anthem Insurance who received shares of Anthem common stock when Anthem Insurance demutualized in 2001.

11.     The wrongful actions of Anthem and Anthem Insurance caused the named Plaintiff and each Class member to be injured by receiving fewer shares of Anthem common stock than each was entitled to receive but for such wrongful actions.

12.     The wrongful actions of Anthem and Anthem Insurance also diluted Plaintiff's and each Class member's equity interests in Anthem and Anthem Insurance. Such dilution reduced the value of the Anthem shares received by Plaintiff and each Class member.

13.     Jorling brings this class action, pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of the Class defined in Paragraph Nine (9) above.

14.     The named Plaintiff is a member of the Class he seeks to represent.

15.     The members of the Class are so numerous that joinder of all members is impracticable, as required by Fed. R. Civ. P. 23(a)(1). While the exact number and identity of all Class members is unknown to the named Plaintiff at the present time, that information is identifiable and will be ascertained through appropriate discovery. On information and belief, there are approximately 200,000 former mutual members of Anthem Insurance who received shares of Anthem common stock as their demutualization compensation. Therefore, the named Plaintiff alleges on information and belief that the Class he seeks to represent certainly consists of tens of thousands of individuals and other persons.

16.     There are questions of law or fact common to all members of the Class in satisfaction of the requirements of Fed. R. Civ. P. 23(a)(2). Moreover, such common questions predominate

4

over any questions affecting only individual members of the Class, as required by Fed. R. Civ. P. 23(b)(3). These common legal and factual questions derive from a common nucleus of operative facts regarding the Anthem Defendants' liability for (i) failure to allocate and issue a sufficient number of the shares of Anthem common stock to each member of the Class, and (ii) the dilution of the equity interests of the former mutual members, in breach of the Anthem Defendants' duties owed to and contractual covenants with the members of the Class. These common questions include, without limitation:

(a)    whether the Anthem Insurance breached fiduciary duties owed to the members of the Class;

(b)    whether the Anthem Defendants breached other duties of due care they owed to the members of the Class;

(c)    whether the Anthem Defendants breached contractual obligations they owed to the members of the Class;

(d)    whether the Anthem Defendants improperly determined that certain Grandfathered Groups were entitled to Anthem share allocations;

(e)    whether certain Grandfathered Groups were properly entitled to Anthem share allocations;

(f)    whether the Anthem Defendants complied with the provisions of various merger agreements and related documents, articles of incorporation, insurance policies (referred to as "Guaranty Policies"), certificates of membership and corporate bylaws that determined mutual memberships and entitlements to demutualization compensation;

(g)    whether the Anthem Defendants complied with the provisions of certain state statutes governing entitlements to demutualizaiton compensation;

5

(h)    whether the Anthem Defendants allocated too few Anthem shares to each of the members of the Class;

(i)    whether the Anthem Defendants improperly diluted the equity interests of each member of the Class in Anthem and Anthem Insurance; and

(j)    whether the dilution of the Class members' equity interests caused a reduction in the value of the Anthem shares received and held by Class members.

17.    The claims of the named Plaintiff are typical of the claims of the Class he seeks to represent, pursuant to Fed. R. Civ. P. 23(a)(3). There are no conflicts between the interests of the named Plaintiff and the interests of the members of the Class as a whole.

18.    The named Plaintiff will fairly and adequately protect and represent the interests of the Class, as required by Fed. R. Civ. P. 23(a)(4). The named Plaintiff's interests are not antagonistic to the interests of any other member of the Class. Moreover, the named Plaintiff has retained competent counsel experienced in class litigation to represent the members of the Class.

19.    A class action is superior to other available methods for fair and efficient adjudication of this litigation, in satisfaction of the requirements of Fed. R. Civ. P. 23(b)(3), since individual joinder of all members of the Class is impracticable. Even if the members of the Class were able individually to prosecute their individual actions, it would be unduly burdensome on the courts to proceed with several thousand individual cases. By contrast, the class action device presents far fewer management difficulties and provides the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

## RELEVANT FACTUAL BACKGROUND

20.    Prior to November 2, 2001, Anthem Insurance was a mutual insurance company, primarily engaged in the business of providing health insurance coverage to its policyholders and other insureds.

6

21.    The policyholders and insureds of Anthem Insurance had membership interests in the mutual company with attendant ownership rights.  Just as stockholders own a company organized as a stock corporation, the policyholders and insureds ("members") of a mutual insurer are its owners. For example, the policies and certificates of coverage acquired by Anthem Insurance's members entitled them to receive distributions in the event of liquidation, to vote on the election of directors, to vote on whether to approve the demutualization, as well as other matters relating to Anthem Insurance that in a stock corporation would be required to be voted on by the shareholders, and to receive compensation in the event of a demutualization.

22.    On or about June 18, 2001, the Board of Directors of Anthem Insurance approved a "Plan of Conversion to A Stock Insurance Company" (the "Plan") (attached hereto as Exhibit "A" and incorporated by reference herein), in accordance with the Indiana demutualization statutes, Indiana Code 27-15-2 *et seq.*, to convert from a mutual insurance company to a stock insurance company.  Anthem Insurance would then become a wholly-owned subsidiary of a newly-formed stock holding company, Anthem.

23.    Under the applicable Indiana laws governing the demutualization, as a result of the conversion of Anthem Insurance from a mutual insurance company to a stock insurance company, Anthem Insurance was required to distribute either cash or Anthem common stock in exchange for the membership interests of Anthem Insurance's eligible members.

24.    Under the Plan, Anthem Insurance proposed to extinguish the membership interests of its members and exchange them for consideration in the form of either cash or the common stock of Anthem.  The default mechanism under the Plan was cash compensation.  In other words, eligible members had to affirmatively elect Anthem stock compensation to ensure their receipt of stock. Eligible members that made no stock elections would potentially be compensated in stock or cash, dependent upon the availability of stock or cash.

7

25.    The Plan provided that the aggregate consideration to be distributed to Anthem Insurance's eligible members, in exchange for their membership interests, would be equal to the value of 100 million Anthem shares (subject to a possible upward adjustment for rounding). Each eligible member would receive, at a minimum, 21 shares of Anthem common stock or its cash equivalent (referred to as the "fixed component" of the demutualization compensation).

26.    The Anthem Defendants engaged the investment-banking firm Goldman, Sachs & Company ("Goldman Sachs") to serve as both the financial adviser for the demutualization and as lead underwriter for the initial public offering ("IPO") of Anthem common stock. The Anthem IPO was to precede the demutualization and would raise most of the funds needed to pay cash compensation to most of the members who did not elect stock.

27.    The Plan tied the cash compensation directly to the IPO share price. The amount of cash paid to those members receiving cash compensation instead of stock would be equal to the number of Anthem shares allocated to each member multiplied by either (i) the price at which Anthem's common stock would be offered for sale in the IPO, or (ii) the IPO price enhanced by a "top-up" provision of as much as 10% more in the event the average closing prices of Anthem common stock for the twenty (20) consecutive days following the Effective Date of the demutualization exceeded 110% of the IPO share price.

28.    To effect the demutualization, the Anthem Defendants solicited approval of the Plan from Anthem Insurance's members principally residing in four states, Ohio, Indiana, Connecticut and Kentucky. The Board of Directors of Anthem Insurance recommended that the mutual members vote to approve the Plan.

29.    On October 2, 2001, the Indiana Insurance Commissioner ("Commissioner") held a public hearing on the Plan in Indianapolis, Indiana.

30.    On October 25, 2001, the Commissioner issued her "Findings of Fact, Conclusions of

8

Law and Order Granting Application with Conclusions ("Order") approving the Plan (attached hereto as Exhibit "B" and incorporated by reference herein).

31.     On October 29, 2001, at a special meeting held at 10:00 a.m. in Indianapolis, Indiana, the members approved the Plan. Having successfully solicited approval from members, Anthem and Anthem Insurance became obligated to pay compensation in the form of cash or Anthem common stock to approximately one million members.

32.     The Anthem IPO was launched on October 29, 2001, mere hours after the special meeting had adjourned. Forty-eight million shares of Anthem common stock were sold for $36.00 per share primarily to institutional investors and retail customers of Wall Street investment banks. Within a few days, the underwriters exercised their options and purchased an additional 7.2 million Anthem shares. Therefore, a total of 55.2 million shares were sold in the Anthem IPO.

33.     After paying the underwriter's discount, Anthem received net proceeds of $34.344 per IPO share. In total, the Anthem IPO raised $1,895,788,800.

34.     On October 30, 2001, Anthem common stock began trading on the New York Stock Exchange and Anthem became a public company.

35.     The effective date of the demutualization was November 2, 2001. On that date, Anthem Insurance converted from a mutual to a stock company and approximately one million mutual membership interests were extinguished. Anthem also became the corporate parent of Anthem Insurance.

36.     In or about late December 2001, the Anthem Defendants issued approximately 48,095,675 shares of Anthem common stock and mailed checks totaling approximately $2.0636 billion to approximately one million former members of Anthem Insurance principally residing in Ohio, Indiana, Kentucky and Connecticut.

37.     Jorling received twenty-seven (27) shares of Anthem common stock in late December

2001 as compensation for Anthem Insurance's demutualization.   The other Class members also received Anthem shares in late December 2001.

38.     Immediately after the IPO and the demutualization, a total of 103,295,675 shares of Anthem common stock were issued and outstanding.

A.     THE PLAN PROVIDED FOR A FIXED AND FINITE NUMBER (100 MILLION) OF ANTHEM SHARES TO BE ALLOCATED AMONG THE MEMBERS.

39.     The Plan provided (Exhibit "A," Article V, section 5.1) that the aggregate consideration to be distributed to members in exchange for their membership interests would be equal to the value of 100 million shares of Anthem common stock (subject to a possible upward adjustment for rounding).

40.     The 100 million Anthem shares were allocated among approximately one million members of Anthem Insurance in individualized amounts based upon several factors, including without limitation the type of health insurance policy and the length of coverage.

41.     Given that only a finite number of Anthem shares (fixed at 100 million) were available for allocation among the membership, if one or more members received a share allocation greater than they should have received, Anthem Insurance's other members would each receive a proportionately smaller share allocation.

42.     Similarly, if the Anthem Defendants mistakenly allocated shares to a customer or policyholder who was not a mutual member of Anthem Insurance or who was not otherwise entitled to demtutualization compensation, then all of Anthem Insurance's members who were entitled to compensation would receive proportionately smaller share allocations.

43.     Both the cash paid and the shares actually issued to a member depended on his individualized share allocation.  Therefore, an under-allocation of Anthem shares to a member necessarily caused him injury as he later received less cash or fewer shares because of the under-allocation.

44.     As more fully described below, the Anthem Defendants under-allocated Anthem shares for Jorling and each member of the Class he seeks to represent.  This class-wide under-allocation of shares caused Jorling and each Class member to receive fewer Anthem shares in December 2001 than he or she properly should have received.

B.    THE COMPLEXITY OF ANTHEM INSURANCE'S RULES GOVERNING MEMBERSHIP AND ENTITLEMENT TO DEMUTUALIZATION COMPENSATION RESULTED FROM THREE MERGERS IN THE DECADE OF THE 1990'S.

45.     The under-allocation of shares to the Class members in 2001 is directly attributable to the manner in which Anthem Insurance was formed.

46.     Anthem Insurance's predecessor was Associated Insurance Companies, Inc. ("Associated"), an Indiana mutual insurance company, which was primarily a health insurer.

47.     Under Associated's articles of incorporation and bylaws, not every policyholder or customer was a member of the mutual company.  For instance, Associated served as the claims administrator for numerous self-insured arrangements, and the customers involved (usually large employers) could not be mutual members.  On the other hand, the owners of individual health insurance policies were members of Associated, but the owners of group health policies (primarily employers) were not Associated members.

48.     For Associated's group health insurance policies sold in Indiana, the employers were *not* members of Associated.  Instead, the employees and retirees insured under Associated's group health insurance policies issued to employers in Indiana were the members of the mutual company.

49.     In the early 1990's, Associated began acquiring Blue Cross/Blue Shield ("BCBS") licensees in other states.  In 1993, Associated acquired the Kentucky BCBS licensee, Southeastern Mutual Insurance Company ("Southeastern").  In 1995, Associated acquired an Ohio BCBS licensee, Community Mutual Insurance Company ("CMIC").  After acquiring CMIC, Associated changed its name to Anthem Insurance and changed CMIC's name to Community Insurance

Company ("CIC"). In 1997, Associated acquired Blue Cross & Blue Shield of Connecticut ("BCBS-CT").

50.    Prior to the acquisitions, Southeastern, CMIC and BCBS-CT were mutual insurance companies, each with its own mutual members. Associated structured each of the three acquisitions as a merger of two mutual companies. The members of each BCBS licensee acquired by Associated exchanged their membership interests for memberships in Associated. After the Kentucky merger, Southeastern's members became members of Associated. After the Ohio merger, CMIC's members became members of Associated. After the Connecticut merger, BCBS-CT's members became members of Associated.

51.    Prior to the mergers, each BCBS licensee had its own rules for determining membership in the mutual company. These rules were set forth in the respective articles of incorporation and bylaws of Southeastern, CMIC and BCBS-CT. Prior to the mergers, the insurance statutes of Kentucky, Ohio and Connecticut also governed matters like mutual membership and the rights of mutual members to vote, to receive liquidating distributions, and to receive compensation in the event of a demutualization.

52.    As to the members of the acquired mutual companies, the three merger agreements generally *preserved* their *pre-merger* membership interests and other rights of mutual membership, including voting rights, rights to distributions upon liquidation, and rights to compensation in the event of a demutualization. Essentially, Associated (later Anthem Insurance) agreed to "grandfather" the membership interests and equity rights of the former members of Southeastern, CMIC and BCBS-CT by giving them equivalent membership interests and equity rights in Associated.

53.    The three merger agreements also provided that Associated's (later Anthem Insurance's) membership rules would apply to any new health insurance policies issued by

Southeastern, CIC and BCBS-CT after each respective merger.

54. However, an exception was made in the merger agreements for newly-issued policies that merely served as replacements for policies issued by Southeastern, CMIC and BCBS-CT. If the newly-issued policy merely replaced a policy issued before the three mergers, Associated's membership rules did not apply to the replacement policy unless Associated (later Anthem Insurance) had issued the original policy. The pre-merger membership rules of Southeastern, CMIC and BCBS-CT continued to apply to replacement policies issued after the mergers.

55. The practice of "grandfathering" mutual memberships created a complex set of rules that Anthem Insurance had to administer when it demutualized in 2001.

56. The three mergers and the practice of "grandfathering" left Anthem Insurance with six sets of membership rules in 2001. The first set of membership rules were Associated's rules applicable to all policies issued by Associated (later Anthem Insurance). The second, third and fourth sets of rules were those of Southeastern, CMIC and BCBS-CT, respectively. These three sets of rules applied to all policies issued before the mergers by Southeastern, CMIC and BCBS-CT that remained in-force at the time Anthem Insurance demutualized in 2001. The fifth set of rules was Associated's (later Anthem Insurance) membership rules applicable to all new policies issued after the mergers by Southeastern, CMIC and BCBS-CT. The sixth set of membership rules applied when Southeastern, CMIC and BCBS-CT issued replacement policies. The pre-merger membership rules of Southeastern, CMIC and BCBS-CT continued to apply to the post-merger replacement policies they issued.

57. At the time Anthem Insurance demutualized in 2001, it was required to apply these six sets of membership rules on a policy-by-policy basis to hundreds of thousands of in-force policies to determine which policyholders were members entitled to compensation.

58. After applying the six sets of membership rules to hundreds of thousands of health

insurance policies that were in-force at the time of the demutualization, Anthem Insurance determined that approximately one million of its 7.5 million policyholders and customers were mutual members entitled to demutualization compensation.

C. THE ANTHEM DEFENDANTS MADE ERRONEOUS DETERMINATIONS THAT CERTAIN EMPLOYERS IN OHIO AND CONNECTICUT WERE MUTUAL MEMBERS WITH ACCOMPANYING ENTITLEMENTS TO DEMUTUALIZATION COMPENSATION.

59.    As described above, Associated's (later Anthem Insurance) membership rules did not permit employers that owned group health insurance policies issued by Anthem Insurance to be mutual members with accompanying equity rights.  The employers in Indiana that owned group policies issued by Anthem Insurance were *not* entitled to demutualization compensation.

60.    The Commissioner's Order approving the demutualization noted that Indiana employers were not members of Anthem Insurance: "Group policyholders [employers] in Indiana are not Statutory Members (the individual certificate holders [employees] under those group Policies are Statutory Members)."  (Exhibit "B," ¶ 26 at 7.)

61.    After applying its complex membership rules, Anthem Insurance determined that over 10,000 employers in Kentucky, Ohio and Connecticut were members of Anthem Insurance entitled to demutualization compensation.

62.    Anthem Insurance determined that approximately 6,600 Ohio employers were members of Anthem Insurance with "grandfathered" entitlements to demutualization compensation. Anthem Insurance allocated approximately 15 million shares of Anthem common stock to Grandfathered Groups in Ohio.  Accordingly, Anthem issued approximately 15 million of its shares to these Ohio Grandfathered Groups.

63.    Anthem Insurance determined that approximately 3,965 Connecticut employers were members of Anthem Insurance with "grandfathered" entitlements to demutualization compensation. Anthem Insurance allocated approximately 4.8 million shares of Anthem common stock to

Grandfathered Groups in Connecticut. Accordingly, Anthem issued approximately 4.8 million of its shares to these Connecticut Grandfathered Groups.

64.     For the reasons detailed below, Anthem Insurance erroneously determined that the Grandfathered Groups in Ohio and Connecticut were entitled to demutualization compensation.

D.     UNDER OHIO'S DEMUTUALIZATION STATUTE, THE OWNER (USUALLY AN EMPLOYER) OF A GROUP HEALTH INSURANCE POLICY HAS NO ENTITLEMENT TO DEMUTUALIZATION COMPENSATION.

65.     At the time Anthem Insurance demutualized, the Ohio Grandfathered Groups (employers) owned group health insurance policies that had been issued by CMIC prior to its 1995 merger with Associated (later Anthem Insurance) or, alternatively, replacement policies issued by CIC (successor to CMIC) at the time Anthem Insurance demutualized.

66.     Approximately 15 million Anthem shares were allocated and issued to the Ohio Grandfathered Groups because Anthem Insurance determined that, immediately prior to the 1995 merger, the Ohio Grandfathered Groups were mutual members of CMIC and entitled to demutualization compensation under Ohio law.

67.     While the Ohio Grandfathered Groups may have been considered to be mutual members of CMIC prior to the 1995 merger for purposes other than demutualization, the Ohio demtutualization statute specifically provided that the employees insured under the pre-merger group health insurance policies issued by CMIC to the Ohio Grandfathered Groups were entitled to demutualization compensation, not their employers.

68.     It may have been possible for Anthem Insurance to "grandfather" the Ohio employers' membership interests in CMIC for some purposes, like voting. It was, however, impossible for Anthem Insurance to preserve for the Ohio employers a right to demutualization compensation that did not exist for them under the Ohio statute, but belonged to their employees instead. Rights to demutualization compensation did not accompany any membership interests in

Anthem Insurance that the "grandfathered" Ohio employers may have obtained from the 1995 merger between Associated and CMIC.

69.     In the event an Ohio mutual insurance company, such as CMIC, converts to a stock insurance corporation, R.C. 3913.22(A) provides that each mutual *policyholder* is entitled to shares of stock of the new stock corporation. For purposes of R.C. 3913.20 through 3913.23, inclusive, Section 3913.20(B) defines the term "policyholder" as follows:

> (B) *"Policyholder" means the person, group of persons*, association, corporation, partnership, or other entity *named as the insured* under a mutual policy of insurance other than life issued and in force on the date of the examination conducted pursuant to division (C) of section 3913.21 of the Revised Code. (Emphasis supplied.)

70.     In the event an Ohio mutual insurance company, such as CMIC, converts to a stock insurance corporation, R.C. 3913.22(A) provides that each mutual *policyholder* is entitled to stock compensation and limits the cash payment to a *policyholder* to the value of just a fractional share. In relevant part, R.C. 3913.22(A) reads as follows:

> In effecting a conversion of a mutual insurance company into a stock insurance corporation pursuant to sections 3913.20 to 3913.23, inclusive, of the Revised Code, *each mutual policyholder is entitled to such shares of stock of the new corporation as his equitable share of the value of the mutual company will purchase. If such equitable share of the value of the mutual company entitles a policyholder to a fractional share of stock, he shall have the option of receiving the value of such fractional share in cash or of purchasing such additional fraction as will entitle him to a full share.* (Emphasis supplied.)

71.     R.C. 3913.22(A) permits the payment of cash compensation to a *policyholder*, but only to the extent of the value of a fractional share. The statute provides the *policyholder* with the option of receiving the value of a fractional share in cash. Under R.C. 3913.22(A), the converting mutual, such as CMIC, does not have the authority to pay cash to a *policyholder* for the full value of even a single share. The statute limits the cash payment to a *policyholder* to the value of just a

fractional share and only at the option of the *policyholder*.

72.    In the event an Ohio mutual insurance company, such as CMIC, converts to a stock insurance corporation, R.C. 3913.22(D) provides that each mutual *policyholder's ownership interest* in the converting mutual company terminates. Thereafter, his ownership interest is represented solely by the shares of stock of the new corporation issued to him. R.C. 3913.22(D) provides in pertinent part:

> From and after the date of issuance of shares to a *policyholder* pursuant to sections 3913.20 to 3913.24, inclusive, of the Revised Code, *his ownership interest in the company as a mutual policyholder* terminates, and such *ownership interest* shall thenceforth be represented solely by the shares of stock in the new corporation issued to him, but no other rights or liabilities of the policyholder arising under his policy are affected by such issuance of stock. (Emphasis supplied.)

73.    Prior to the conversion of an Ohio mutual insurance company to a stock insurance corporation, R.C. 3913.22(D) expressly provides that each *policyholder* has an ownership interest in the mutual company.

74.    Under well-established principles of insurance law, a mutual insurance company is owned by its *members* collectively.

75.    Thus, for demutualization purposes in Ohio, the Ohio insurance statute clearly recognizes the *policyholders* (defined by R.C. 3913.20(B) to be *"the person [or] group of persons ... named as the insured under a mutual policy of insurance"*) to constitute both (i) the owners-members of the mutual insurance company pursuant to R.C. 3913.22(D), and (ii) the persons *entitled* to the shares of the new stock corporation pursuant to R.C. 3913.22(A).

76.    In the event the Anthem Defendants dispute whether the employees were "named insureds" under a group health policy issued by CMIC, and thus whether they were "policyholders" as that term is defined in R.C. 3913.20(B), the term *"named insured"* is defined as follows:

> **Named insured**. In insurance, ***the person specifically designated in the policy as <u>the one protected</u>*** and, commonly, it is the person with whom the contract of insurance has been made.

BLACK'S LAW DICTIONARY 922 (5th ed. 1979) (emphasis supplied).

77.    As noted by the leading treatise on insurance law, in the context of a group health insurance policy, ***the employee or retiree is the one named as the insured***:

> Policies of medical insurance generally cover the named insured, and dependents of the named insured. Although assessments on a policy of group medical insurance are primarily the responsibility of the employer or other entity which purchased the policy, the insured under such a policy is the employee or group member.

10A *G. Couch, Insurance*, § 144:26 (3rd ed. 1998).

78.    Almost a dozen Ohio health insurance statutes support the conclusion that, in the context of group health insurance, the active and retired employees are the named insureds, not their employer.  These health insurance statutes uniformly refer to employees as the "insureds" or as members of the "insured group" under a group policy, including without limitation R.C. 3923.12(C)(2), 3923.12(C)(3), 3923.13(B), 3923.121(A)(3), 3923.123(A)(3), 3923.381(A)(2), 3923.38(A)(1)(a), 3923.44(H), 3923.44(I), 1751.56(A)(3) and 1751.56(B).

79.    The Ohio Department of Insurance published a booklet entitled *Health Insurance Guide: How to Get the Most Out of Your Health Coverage* (attached hereto as Exhibit "C" and incorporated by reference herein).  In this official publication of the State of Ohio, Chapter 10 contains a glossary of common terms used in the context of health insurance.  The term "certificate holder" is defined as "***[a]n employee or other insured named under a group health insurance policy***" (emphasis supplied).  This definition adopted by the Ohio Department of Insurance further evidences the fact that employees were the named insureds under the group health policies issued by CMIC, not their respective employers.

80.     Anthem Insurance prepared a document entitled *Notice of Privacy Practices* (attached hereto as Exhibit "D" and incorporated by reference herein) and distributed it in connection with its group health policies. The *Notice* clearly indicates that Anthem Insurance considers an employee to be the "named insured" when covered by an employer-sponsored group health policy. For example, in explaining the delivery of revised privacy notices, at paragraph 2 on page 1 entitled "Our Legal Duties," Anthem Insurance told its policyholders:

> Any revised notice will be provided to you by one of the following means: (1) By mail to the named insured under the terms of your coverage. (2) By delivery of the notice by ***the named insured's employer if you are enrolled in employer-sponsored group insurance coverage.*** (Emphasis supplied.)

81.     As the persons or members of the group of persons ***named as the insureds***, the employees were ***policyholders*** of a mutual insurance company who, under R.C. 3913.22(A), were entitled to receive compensation in the form of shares of stock in the event CMIC converted from a mutual insurance company into a stock corporation. In addition, R.C. 3913.22(D) specifies that the employees as ***policyholders*** have ownership rights and interests in a mutual insurance company. Thus, at least for demutualization purposes, the Ohio demutualization statute recognized the employees as the ***members*** of a mutual company.

82.     Immediately prior to the 1995 merger, the Ohio Grandfathered Groups owned group health policies issued by CMIC, and may have been deemed policyholders of CMIC for other purposes. However, these Ohio Grandfathered Groups were ***not*** named insureds under the group health policies and thus were not "***policyholders***" within the definition of R.C. 3913.20(B). Therefore, under R.C. 3913.22(A), the Grandfathered Groups were not entitled to stock compensation upon CMIC's demutualization, and were not specified as having ownership rights and interests in a mutual insurance company by R.C. 3913.22(D). Thus, the Grandfathered Groups were not recognized by the relevant Ohio insurance statutes as members of a mutual insurance company

for demutualization purposes.

E.   FOLLOWING CMIC'S 1995 ACQUISITION BY ANTHEM INSURANCE, OHIO EMPLOYERS AND
     OTHER GROUP HEALTH POLICY OWNERS WERE NOT ENTITLED TO STOCK COMPENSATION
     UPON ANTHEM INSURANCE'S DEMUTUALIZATION.

83.   Effective October 1, 1995, Associated, an Indiana mutual insurance company,

acquired CMIC through a merger transaction.  As alleged above, Associated was the predecessor of

Anthem Insurance and changed its name to Anthem Insurance after the merger.

84.   Under the "Plan and Joint Agreement of Merger," dated September 29, 1995, by and

between CMIC and Associated ("PJAM-OH") (attached hereto as Exhibit "E" and incorporated by

reference herein), the former members of CMIC were given rights in the event of Associated's (later

Anthem Insurance's) demutualization.  PJAM-OH was the agreement that effectuated the merger

between Associated and CMIC.

85.   Article III, Section 3.1(B)(3) of PJAM-OH, entitled "Effect of Merger," provided to

the former CMIC members:

> *rights in the event of ... demutualization of Associated ...*
> as set forth herein, therein and in Associated's Second
> Amended and Restated Articles of Incorporation, *which
> rights are intended to be equivalent to the rights such
> Member would have had if such [CMIC] Member had
> owned an insurance policy, issued directly by Associated,*
> having terms, conditions and benefits equivalent to that
> [CMIC] Member's insurance policy or health care benefits
> contract, as the case may be, assumed by CIC *and which
> rights shall reflect and include in full ... the value of that
> [CMIC] Member's interest in [CMIC] immediately prior
> to the Effective time of the Merger*.  (Emphasis supplied.)

86.   Giving proper effect to Section 3.1(B)(3) of PJAM-OH, if Associated (instead of

CMIC) had issued the group health insurance policies to the Ohio Grandfathered Groups (usually

employers), then Associated's membership rules and *not* CMIC's membership rules would have

determined whether these Ohio employers were mutual members or whether their insured employees

were mutual members.  For group health insurance policies issued by Associated (later Anthem

Insurance), *the employer was not the member* – its mutual members were the employees insured by the Associated group health policy. Therefore, Section 3.1(B)(3) of PJAM-OH prevented Associated from recognizing employers (the Ohio Grandfathered Groups) as its members, and required Associated to recognize the insured employees as its mutual members instead.

87.     Section 3.1(B)(3) of PJAM-OH specified that the demutualization rights of CMIC's former members were also set forth in the Second Amended and Restated Articles of Incorporation of Associated Insurance Companies, Inc. ("Second Amended Articles") (attached hereto as Exhibit "F" and incorporated by reference herein). In Article VIII, Section 8.3, entitled "Liquidation, Merger or Demutualization," the former members of CMIC had their rights in the event of Associated's (later Anthem Insurance's) demutualization specified:

> Accordingly, *upon any ... demutualization ... of [Associated* (later Anthem Insurance)] ... in the determination of the rights of any member of [Associated (later Anthem Insurance)] who was, immediately prior to the Community Merger, a member of [CMIC], *full account and credit shall be given to such member of its former interests in [CMIC], which rights shall reflect and include in full ... the value of such member's interests in [CMIC] immediately prior to the Community Merger* (it being understood for, illustrative purposes, that if a ... demutualization ... of [Associated (later Anthem Insurance)] had occurred immediately after the Community Merger, each member of [Associated (later Anthem Insurance)] who was, immediately prior to the Community Merger, a member of [CMIC], would be entitled to the same value, calculated in accordance with *Ohio law*, as though a ... demutualization ... of [CMIC] had occurred immediately prior to the Community Merger). (Emphasis supplied.)

88.     Following consummation of the 1995 merger between Associated and CMIC, Section 3.1(B) of PJAM-OH required Associated to issue a guaranty policy/membership certificate to each of CMIC's former members. The specimen form of the group Guaranty Health Policy for Current Community Members and Certificate of Membership ("Guaranty Policy for Current Groups") is

attached hereto as Exhibit "G" and incorporated by reference herein.

89.    The Guaranty Policy for Current Groups, at Article IV entitled "Membership Rights," provided the following rights in the event of Associated's (later Anthem Insurance's) demutualization:

> As long as this Policy is in effect, the Associated Member shall be entitled to all of the rights of membership in Associated accorded to members of a mutual insurance company under Indiana law, *including … equity rights on the event of … demutualization as provided in Associated's Articles of Incorporation* from time to time in effect. *Such equity rights are intended to be equivalent to the rights which the Associated Member would have as a member under an Associated policy if Associated, rather than [CMIC], had issued the [CMIC] Contract,* and shall accrue solely to the Associated Member. No Enrollee or dependent of an Enrollee shall receive any equity rights by virtue of being an Enrollee or dependent of an Enrollee. As provided in Associated's Articles of Incorporation from time to time in effect, *the Associated Member's rights shall reflect and include in full the value of the Associated Member's interest in [CMIC] immediately prior to the merger of [CMIC] and Associated* . . . (Emphasis supplied.)

90.    The Guaranty Policy for Current Groups further provided (at page 10) that "[t]he parties to this Policy agree it will be subject to *Ohio law*." (Emphasis supplied.)

91.    In 1995, CMIC and Associated mailed to the Ohio Grandfathered Groups certain merger documents including without limitation PJAM-OH (Exhibit "E"), Second Amended Articles (Exhibit "F"), and Guaranty Policy for Current Groups (Exhibit "G"), as well as the Merger Agreement and *Information Circular* (Exhibits "H" and "I," respectively, below).

92.    Under the "Agreement to Merge" dated March 13, 1995 by and between CMIC and Associated ("Merger Agreement-OH") (attached hereto as Exhibit "H" and incorporated by reference herein), the former members of CMIC became members of Associated and were given rights in the event of Associated's (later Anthem Insurance's) demutualization identical to the

demutualization rights they had under **Ohio law** with respect to CMIC.

93.    Article III, Section 3.1(B)(ii)(c), of the Merger Agreement-OH, entitled "Manner of Effecting Merger," provided to the former CMIC members:

> ***rights in the event of the ... demutualization of Associated*** ... which rights are intended to be equivalent to the rights such Member would have had if such [CMIC] Member had owned an insurance policy, issued directly by Associated, having terms, conditions and benefits equivalent to that [CMIC] Member's insurance policy or health care benefits contract assumed or issued by CIC, and which rights shall reflect and include in full ... the value of that [CMIC] Member's interest in [CMIC] immediately prior to the Effective Time (it being understood, for illustrative purposes, that if a ... demutualization of Associated were to occur immediately after the Effective Time, ***each [CMIC] Member would be entitled to the same value calculated in accordance with the Ohio Insurance Law as though ... a demutualization of [CMIC] had occurred*** immediately prior to the Effective Time). (Emphasis supplied.)

94.    CMIC furnished its members with an *Information Circular* in connection with the solicitation of proxies for the merger with Associated (relevant portions of which are attached hereto as Exhibit "I" and incorporated by reference herein).  On information and belief, CMIC's books and records reflected that the group contract holders (the employers known as "Grandfathered Groups") were the mutual members of CMIC, not the persons (usually employees) named as the insureds, or the group of persons named as the insureds, in the Group Policy.

95.    The *Information Circular* provided at page 3:

> The Guaranty Policy will also afford the member ... (b) rights in the event of the ... demutualization of Associated after the Merger. ***These rights are intended to be equivalent to the rights the member would have if the member owned an insurance policy from Associated*** providing for the same terms, conditions and benefits as provided by the member's New Community insurance policy or health care benefits contract. ***These rights will also include in full the value of the member's interest in [CMIC] immediately prior to the Merger*** . . . (Emphasis supplied.)

23

96.    The *Information Circular* also provided, at pages 10-11:

> The Guaranty Policies will also give membership rights in Associated to the members of [CMIC]. ***The interests of [CMIC's] members will be preserved (essentially transformed into equivalent interests in Associated) and the members' future membership interests in Associated will be equivalent to those they would have if they owned an insurance policy issued directly by Associated*** having terms, conditions and benefits equivalent to those of the New Community policy guaranteed by the Guaranty Policy. (Emphasis supplied.)

97.    Finally, the *Information Circular* stated at page 11:

> Members of Indiana mutual insurance companies like Associated may be entitled to distributions in respect of their proprietary interests in the event of their company's … demutualization. Associated has indicated that it has no current plans for any such transactions, but if any such transaction were to occur, ***the rights of each former member of [CMIC] who is then a member of Associated would reflect in full the value of such member's interest in [CMIC] immediately prior to the Merger*** … (Emphasis supplied.)

98.    Thus, if the Ohio Grandfathered Groups were considered members of CMIC prior to the 1995 merger, the merger agreements and related documents set forth the rights, if any, the Ohio Grandfathered Groups enjoyed upon the demutualization of Anthem Insurance.

99.    The *Information Circular* (Exhibit "I"), at pages 10-11, describes the rights given to CMIC's former members upon Anthem Insurance's demutualization. Such rights considered both the former CMIC members' pre-merger interests in CMIC and the former members' future interests in Associated (later Anthem Insurance).

100.    To preserve their pre-merger interests in CMIC, the *Information Circular* states that the former CMIC members were entitled to the full value of their interests in CMIC immediately before the 1995 merger. The Second Amended Articles (Exhibit "F"), at Article VIII, Section 8.3, and the Merger Agreement-OH (Exhibit "H"), at Article III, Section 3.1(B)(ii)(c), both provide that

such value shall be calculated under Ohio law as though CMIC had demutualized immediately prior to the 1995 merger.

101.   If CMIC had demutualized immediately prior to its 1995 merger with Associated, the Ohio demutualization statute would have governed the demutualization of CMIC.  Under the Ohio demutualization statute, the Ohio Grandfathered Groups would not have been entitled to any compensation in the form of stock or otherwise.  In other words, the value of the Ohio Grandfathered Groups' interests in the event of CMIC's demutualization was zero.

102.   The *Information Circular* states that the former CMIC members' future interest in Associated will be equivalent to those they would have if they had owned insurance policies issued directly to them by Associated (later Anthem Insurance).

103.   If Associated, instead of CMIC, had issued group health policies directly to the Ohio Grandfathered Groups, then the insured employees would have membership interests in Anthem Insurance and entitlements to demutualization compensation, not their employers.  Therefore, the Ohio Grandfathered Groups were not entitled to demutualization compensation arising from any future interests they may have received in Associated (later Anthem Insurance) arising from the 1995 merger.

104.   The Associated/CMIC merger agreements and related documents, including without limitation PJAM-OH, Merger Agreement-OH, *Information Circular*, Second Amended Articles and Guaranty Policy for Current Groups, must be interpreted in a manner that is consistent with the Ohio insurance law in effect at the time of the 1995 merger.  Under Ohio insurance law, and specifically the provisions found in R.C. 3913.20(B), 3913.22(A) and 3913.22(D), in effect at the time of the merger, the employees insured under CMIC's group health insurance policies were entitled to demutualization compensation, not the Ohio Grandfathered Groups.

105.   The express references to "Ohio law" and "Ohio Insurance Law" demonstrate that

Associated and CMIC incorporated into the 1995 merger agreements and related documents the rights that Ohio insurance law provided to the employees insured under CMIC's group health insurance policies, including rights to demutualization compensation.

106.    Therefore, the 1995 merger agreements and related documents could not and did not divest the employees insured under CMIC's group health insurance policies of their rights to stock compensation under *Ohio insurance law*. Nor did the merger documents transfer such rights to demutualization compensation away from the insured employees and to the Ohio Grandfathered Groups (usually employers). Indeed, immediately prior to the 1995 merger between Associated and CMIC, the applicable Indiana insurance law and Associated's own membership rules did not recognize Indiana employers as the mutual members of Associated with entitlements to compensation in the event Associated demutualized.

107.    To the contrary, the 1995 merger agreements and related documents should be construed and interpreted by the Court in a manner that preserves the insured Ohio employees' individual entitlements to demutualization compensation as such entitlements existed immediately prior to the merger.

108.    Statements appearing at page 8 of the *Information Circular* (Exhibit "I") reveal Associated's and CMIC's misunderstanding of *Ohio insurance law*, particularly the provisions of R.C. 3913.20(B), 3913.22(A) and 3913.22(D):

> Group policyholders of [CMIC] also possess certain proprietary rights in [CMIC]. In order to preserve the existing voting and proprietary rights of [CMIC's] group policyholders, *Associated's general practice regarding voting and **other membership rights** relating to group policies will **not apply** to holders of group policies issued by [CMIC]. (Emphasis supplied.)

109.    These statements in the *Information Circular* reveal the Anthem Defendants' intent to preserve proprietary rights for Ohio Grandfathered Groups (usually employers) that simply *did not*

*exist* before the merger and that cannot be reconciled with the provisions of R.C. 3913.20(B), 3913.22(A) and 3913.22(D). The provisions of R.C. 3913.20(B), 3913.22(A) and 3913.22(D) are to the contrary and recognize that the employees insured under CMIC's group health policies had *ownership interests* in the mutual insurer and were *entitled to stock compensation* in the event of CMIC's demutualization.

110. Since 1995 merger agreements and related documents were prepared and executed by Associated and CMIC based on an *incorrect understanding or interpretation of Ohio insurance law*, this Court should interpret such provisions in the merger documents to conform to Ohio insurance law in order to preserve the entitlements to demutualization compensation that existed under Ohio insurance law immediately prior to the merger.

F. ANTHEM INSURANCE'S PLAN OF CONVERSION MISTAKENLY GRANTED MUTUAL MEMBERSHIP INTERESTS AND ENTITLEMENTS TO DEMUTUALIZATION COMPENSATION TO CERTAIN OHIO GROUP CONTRACT HOLDERS (GRANDFATHERED GROUPS).

111. To compensate the members of Anthem Insurance for the loss of their mutual membership and ownership interests upon demutualization, the Plan (Exhibit "A") provided that Anthem would issue to Anthem Insurance's former members either shares of Anthem common stock or cash. (Plan at Art. I, "Manner of Conversion," Sec. 1.2(c)(ii); Art. III, "Distribution of Consideration"; Art. V, "Form and Amount of Consideration to be Distributed," Sec. 5.1; Art. VI, "Payment of Consideration to Eligible Statutory Members," Sec. 6.1.)

112. Article XII of the Plan, "Additional Provisions," at Section 12.1(b), sets forth the membership rules that ostensibly applied to the group health insurance policies that had been issued by CMIC before the 1995 merger with Associated, and that were still in-force in 2001:

> (b)    Except as provided in Section 12.1(c), the *Holder of a Policy that is a group insurance policy* or group health care benefits contract *is the* Person or Persons specified in such Policy as *the policy or contract holder* unless no policy or contract holder is so specified, in which case the Holder is the Person (other than Anthem Insurance) on

27

whose behalf the policy or contract was executed.

113.   By reason of their status as group health insurance **contract holders**, the Plan's membership rules erroneously granted to certain Ohio employers (Grandfathered Groups), and simultaneously denied to their insured employees, the right to receive compensation upon the demutualization of Anthem Insurance.  This erroneous and illegal provision in the Plan essentially nullified the rights that employees insured under CMIC's pre-merger group health policies had to demutualization compensation under **Ohio insurance law (particularly the provisions of R.C. 3913.20(B), 3913.22(A) and (D))**.

114.   Section 12.1(b) of the Plan cannot be reconciled with provisions found in the 1995 merger agreements and related documents that required CMIC's group contract holders (usually employers) to be treated as though Associated had issued group health insurance policies to them for purposes of determining both their membership interests and rights to demutualization compensation.

115.   As discussed above, the plain language of Section 3.1(B)(3) of PJAM-OH (Exhibit "I") explicitly applied Associated's membership and equity rules to CMIC's pre-merger group health insurance policies.  CMIC's group contract holders (usually employers) were to be treated as though Associated, had issued them group health policies. Such treatment made the insured employees the mutual members of Associated (later Anthem Insurance), **not** the Ohio Grandfathered Groups (usually employers).  Section 3.1(B)(3) gave to the former CMIC members:

> rights in the event of …demutualization of Associated … which rights are intended to be equivalent to the rights such Member would have had **if such [CMIC] Member had owned an insurance policy, issued directly by Associated** … (Emphasis supplied.)

116.   The Guaranty Policy for Current Groups (Exhibit "G") issued to every Ohio Grandfathered Group also made it clear that Associated's membership and equity rules applied to

CMIC's pre-merger group health insurance policies. At Article IV of the Guaranty Policy for

Current Groups, equity rights were granted according to Associated's membership rules:

> Such equity rights are intended to be equivalent to the
> rights which the Associated Member would have as a
> member under an Associated policy *if Associated, rather
> than [CMIC], had issued the [CMIC] Contract.*
> (Emphasis supplied.)

117. The Merger Agreement-OH (Exhibit "H") similarly applied Associated's membership

and equity rules to CMIC's pre-merger group health insurance policies. Section 3.1B(ii)(c) of the

Merger Agreement-OH provided to CMIC's former members:

> rights in the event of the ... demutualization of Associated
> ... which rights are intended to be equivalent to the rights
> such Member would have had *if such [CMIC] Member
> had owned an insurance policy, issued directly by
> Associated ...* (Emphasis supplied.)

118. The *Information Circular* (Exhibit "I") emphasized that, after the merger with

Associated, CMIC's group contract holders were to be treated as though Associated (instead of

CMIC) had issued group health insurance policies to them. At page 3, the *Information Circular*

provided:

> The Guaranty Policies will also afford the member ... (b)
> rights in the event of the ... demutualization of Associated
> after the Merger. These rights are intended to be equivalent
> to the rights the member would have *if the member owned
> an insurance policy from Associated.* (Emphasis supplied.)

119. This Court should reform the provisions in the Plan that purport to grant entitlements

to demutualization compensation to Ohio Grandfathered Groups because they are contrary to

provisions in the 1995 merger agreements and related documents and Ohio insurance law. These

Plan provisions reveal Anthem Insurance's misunderstanding of Ohio insurance law and its apparent

disregard for provisions in the 1995 merger agreements and related documents. As described above,

the 1995 merger documents treat CMIC's pre-merger group contract holders (usually employers) as

though Associated had issued to them group health policies. Therefore, the Plan should have applied Associated's rules to the Ohio Grandfathered Groups for purposes of determining their membership interests in Anthem Insurance and equity rights in the event of demutualization.

G.    ANTHEM INSURANCE MISTAKENLY GRANTED MUTUAL MEMBERSHIP INTERESTS AND ENTITLEMENTS TO DEMUTUALIZATION COMPENSATION TO CERTAIN CONNECTICUT GROUP CONTRACT HOLDERS (GRANDFATHERED GROUPS).

120.    As described above, Anthem Insurance determined that certain group contract holders (usually employers) in Connecticut were its mutual members with entitlements to demutualization compensation. These group contract holders are referred to as the Connecticut Grandfathered Groups.

121.    Anthem Insurance determined that there were approximately 3,965 Connecticut Grandfathered Groups and allocated approximately 4,800,000 shares of Anthem common stock to them. Following Anthem Insurance's demutualization, Anthem issued approximately 4.8 million of its shares to the Connecticut Grandfathered Groups.

122.    In determining that the Connecticut Grandfathered Groups (usually employers) had "grandfathered" membership interests with accompanying rights to demutualization compensation, Anthem Insurance apparently disregarded the bylaws of BCBS-CT (the "By-Laws") (attached hereto as Exhibit "J" and incorporated by reference herein) that existed immediately before the 1997 merger.

123.    The By-Laws provided that, in the case of a group health insurance policy, *the group as a whole* was considered to be one policyholder. The By-Laws also provide that BCBS-CT had one class of mutual members, known as Voting Members, and that any policyholder was a Voting Member. Therefore, in the case of a group health policy, *the group as a whole* (the insured employees) was the Voting Member, not their employer. BCBS-CT's By-Laws provided, in relevant part at Article II, as follows:

Section 1.  General.  [BCBS-CT] shall have one class of members, known as Voting Members, and this class shall possess all the voting powers of the membership.  A Voting Member shall be any policyholder of [BCBS-CT] as hereinafter defined.  The term "policyholder" shall mean any of the following:

\*       \*       \*

(b)     *In the case of a group insurance policy, the group as a whole shall be considered one policyholder*, and such policyholder's rights as a Voting Member shall be exercised by the individual designated in, or pursuant to, such policy to act for the group for voting purposes.  Individual members of the group shall not be considered Voting Members.  (Emphasis supplied.)

124.    Under the By-Laws, the insured groups of employees were the members of BCBS-CT.  When Anthem Insurance and BCBS-CT merged in 1997, these groups of insured employees were entitled to have had their pre-merger group membership interests and equity rights in BCBS-CT "grandfathered," not their respective employers.

125.    If the drafters of the By-Laws had intended for group contract holders (usually employers) to be Voting Members of BCBS-CT, then the By-Laws could have been written to expressly provide that the owners of group insurance policies or the group contract holders were BCBS-CT's Voting Members.  Instead, the relevant language in the By-Laws defines the term "policyholder" for membership purposes as *"the group as a whole."*

126.    Under the By-Laws, the group contract holder (usually the employer) may exercise the voting rights for *"the group as a whole,"* but the group contract holder is *not* the Voting Member.

127.    Since employers (group contract holders) were not among BCBS-CT's Voting Members immediately prior to the 1997 merger, the Connecticut Grandfathered Groups should have consisted of the various groups of insured employees, *not* their respective employers as Anthem Insurance erroneously determined.

31

H.   FOLLOWING ANTHEM INSURANCE'S 1997 ACQUISITION OF BCBS-CT, CONNECTICUT EMPLOYERS AND OTHER GROUP HEALTH POLICY OWNERS WERE NOT LEGITIMATE MEMBERS OF ANTHEM INSURANCE, AND THEREFORE WERE NOT ENTITLED TO STOCK COMPENSATION WHEN ANTHEM INSURANCE DEMUTUALIZED.

128.    In 1997, Anthem Insurance acquired BCBS-CT through a merger transaction.

129.    Under the 1997 merger agreement between Anthem Insurance and BCBS-CT, the "Plan and Joint Agreement of Merger" ("PJAM-CT") (attached hereto as Exhibit "K" and incorporated by reference herein), BCBS-CT's members became members of Anthem Insurance with rights to compensation in the event Anthem Insurance subsequently demutualized.

130.    PJAM-CT, Article III entitled "Effect of Merger," Section 3.1, provided in relevant part:

> Section 3.1   Effect of Merger on BCBS-CT Members.  As of the Effective Time, each person who is a member of BCBS-CT (each, a "BCBS-CT Member") shall, by virtue of the Merger and without any action on the part of the BCBS-CT Member, receive in exchange for such Member's interest in BCBS-CT:
>
> (B)    A new Anthem guaranty policy, which shall grant to such person the following rights:
>
> > (1)    *voting rights* on all matters that come before the *members of and Indiana domestic mutual insurance company* under the Indiana Insurance Law and as provided in the [Anthem Insurance] Articles;
> >
> > *        *        *
> >
> > (3)    *rights in the event of the ... demutualization of [Anthem Insurance]* as set forth herein, therein and the [Anthem Insurance] Articles ... *which rights are intended to be equivalent to the rights such person would have had if such person had owned an insurance policy issued directly by [Anthem Insurance] ... and which rights shall reflect and include in full ... the value of that person's interest in BCBS-CT immediately prior to the Effective Time* (it being understood, for illustrative purposes, that if a ...

> demutualization of [Anthem Insurance] were to
> occur, immediately after the Effective Time, each
> such person would be entitled to the same value,
> calculated in accordance with ***Connecticut law***, as
> though ... a demutualization of BCBS-CT had
> occurred immediately prior to the Effective Time).
> (Emphasis supplied.)

131.    Giving proper effect to Section 3.1(B)(1) of PJAM-CT, the Voting Members of BCBS-CT became members of Anthem Insurance.  In cases involving group health insurance policies, the various insured groups of employees were BCBS-CT's Voting Members, not their respective employers (group contract holders).  Therefore, PJAM-CT made the insured groups of employees members of Anthem Insurance, not their employers.

132.    Giving proper effect to Section 3.1(B)(3) of PJAM-CT, the insured groups of employees were given rights to compensation in the event Anthem Insurance later demutualized, not their employers.

133.    Giving proper effect to Section 3.1(B)(3) of PJAM-CT, if Anthem Insurance (instead of BCBS-CT) had issued the group health insurance policies to the Connecticut Grandfathered Groups, then Associated's membership rules and not BCBS-CT's membership rules would have determined whether these Connecticut employers were mutual members or whether their insured employees were mutual members.  For group health insurance policies issued by Associated, the employer was not the member-Associated's mutual members were the employees insured by the Associated group health policy.  Therefore, Section 3.1(B)(3) required Anthem Insurance to recognize the insured employees as its mutual members, not their employers (the Connecticut Grandfathered Groups).

134.    Section 3.1(B)(3) of PJAM-CT specified that the demutualization rights of BCBS-CT's former members were set forth in the Third Amended and Restated Articles of Incorporation of Anthem Insurance Companies, Inc. ("Third Amended Articles") (attached hereto as Exhibit "L" and

incorporated by reference herein). In Article VIII, entitled "Liquidation, Merger or Demutualization," Section 8.4, of the Third Amended Articles, the former members of BCBS-CT were given rights in the event of Anthem Insurance's demutualization:

> Accordingly, *upon any ... demutualization* ... of *[Anthem Insurance]* ... in the determination of the rights of any member of [Anthem Insurance] who was immediately prior to [the 1997 merger between Anthem Insurance and BCBS-CT], a member of [BCBS-CT], *full account and credit shall be given to such member of its former interests in [BCBS-CT], which rights shall reflect and include in full ... the value of such member's interests in [BCBS-CT] immediately prior to [the 1997 merger]* (it being understood, for illustrative purposes, that if a ... demutualization ... of [Anthem Insurance] had occurred immediately after [the 1997 merger], each member of [Anthem Insurance] who was, immediately prior to the [1997 merger], a member of [BCBS-CT], would be entitled to the same value, calculated in accordance with the *law of the State of [BCBS-CT's] domicile*, as though a ... demutualization ... of [BCBS-CT] had occurred immediately prior to the [1997 merger]). (Emphasis supplied.)

135.   Giving proper effect to Section 8.4 of the Third Amended Articles, immediately prior to the 1997 merger, the membership interests of the Connecticut Grandfathered Groups (employers) each had zero value since none of them were Voting Members of BCBS-CT. Their employees were the Voting Members of BCBS-CT. The employees' membership interests in BCBS-CT did have value, but Anthem Insurance disregarded their former BCBS-CT membership interests and did not pay them any demutualization compensation.

136.   Under the "Agreement to Merge" dated November 8, 1996, by and between Anthem Insurance and BCBS-CT ("Merger Agreement-CT") (attached hereto as Exhibit "M" and incorporated by reference herein), the former members of BCBS-CT became members of Anthem Insurance and were given rights in the event of Anthem Insurance's demutualization identical to the demutualization rights they had under *Connecticut law* with respect to BCBS-CT.

137.    Article III of the Merger Agreement-CT, entitled "Manner of Effecting Merger," Section 3.3, provided:

> BCBS-CT Members.   As of the Effective Time, each BCBS-CT Member shall, by virtue of the Merger and without any action on the part of such person, receive in exchange for such person's interests in BCBS-CT:
>
> (b)    a new [Anthem Insurance] guaranty policy ... which shall grant to such person the rights described in Section 3.4.

138.    Section 3.4 of the Merger Agreement-CT provided:

> Rights Under [Anthem Insurance's] Guaranty Policy.  All guaranty policies issue by [Anthem Insurance] pursuant to Section 3.3 shall grant the following rights:
>
> (a)    voting rights as provided under the Indiana Insurance law and [Anthem Insurance's] Third Amended and Restated Articles of Incorporation ...
>
> (c)    *rights in the event of the ... demutualization of [Anthem Insurance]* as set forth herein, therein and in [Anthem Insurance's] Third Amended and Restated Articles of Incorporation, *which rights are intended to be equivalent to the rights such person would have had if such person had owned and insurance policy,* or healthcare benefits contract issued directly by [Anthem Insurance] ... and which rights shall reflect and include in full ... the value of that person's interest in BCBS-CT immediately prior to the Effective Time (it being understood, for illustrative purposes, that if a ... demutualization of [Anthem Insurance] were to occur immediately after the Effective Time, *each such person would be entitled to the same value, calculated in accordance with applicable Connecticut law, as though a ... demutualization of BCBS-CT had occurred* immediately prior to the Effective Time).    (Emphasis supplied).

139.    Giving proper effect to Section 3.4(c) of the Merger Agreement-CT, if Anthem Insurance had followed the membership provisions in BCBS-CT's By-Laws, the value to the Connecticut Grandfathered Groups should have been zero.

140.    The members of Anthem Insurance were furnished an *Information Circular* (attached hereto as Exhibit "N" and incorporated by reference herein) in connection with the solicitation of proxies for the merger with BCBS-CT.

141.    The *Information Circular* provided at page 4:

> [Anthem Insurance] will be the surviving corporation in the Connecticut Merger, and *the members of BCBS-CT will become Members of [Anthem Insurance]*.    (Emphasis supplied.)

142.    The *Information Circular* also provided at page 11:

> [Anthem Insurance's] guaranty policies will, in addition, give membership rights in [Anthem Insurance] to the former members of BCBS-CT.   Under the Connecticut Merger Agreement, *the former BCBS-CT members' interests in BCBS-CT will be preserved (transformed into equivalent interests in [Anthem Insurance])* and their *future membership interests in [Anthem Insurance]* will be *equivalent* to those they would have *if they owned an insurance policy* or health care benefit contract *issued directly by [Anthem Insurance]* …   (Emphasis supplied.)

143.    The *Information Circular* state at page 12:

> Members of Indiana mutual insurance companies like [Anthem Insurance] may, under the Indiana Insurance Law, be entitled to distributions in respect of their proprietary interests in the event of their company's … demutualization. [Anthem Insurance] has no current plans for any transaction that would result in such a distribution but, if any such transaction were to occur, *the rights of each former BCBS-CT member who is then a Member of [Anthem Insurance] would reflect in full the value of such Member's interest in BCBS-CT immediately prior to the Connecticut Merger* …   (Emphasis supplied.)

144.    Immediately before the 1997 merger, the Connecticut Grandfathered Groups were not BCBS-CT members.  The *Information Circular* (Exhibit "N") at page 4 makes it clear that the Connecticut Grandfathered Groups did not become Anthem Insurance members since they were not BCBS-CT members.

145.    Therefore, the Connecticut Grandfathered Groups had no pre-merger interests in BCBS-CT to *preserve*, and correspondingly no possibility for any *future membership interests* in Anthem Insurance. (Exhibit "N" at 11.)

146.    The Anthem Insurance/BCBS-CT merger documents, including without limitation PJAM-CT, Third Amended Articles, Merger Agreement-CT and *Information Circular*, must be interpreted in a manner that is consistent with the BCBS-CT By-Laws in effect at the time of the 1997 merger. Under the By-Laws in effect at the time of the merger, the various groups of insured employees were BCBS-CT's members. After the 1997 merger, the insured groups of employees became Anthem Insurance members, not the Connecticut Grandfathered Groups (usually employers) as Anthem Insurance erroneously decided.

147.    Having not been members of BCCS-CT in before the merger, the Connecticut Grandfathered Groups could not and did not become members of Anthem Insurance immediately after the 1997 merger. Therefore, the Connecticut Grandfathered Groups had no rights to receive compensation when Anthem Insurance demutualized in 2001. Instead, the groups of insured employees were entitled to demutualization compensation.

148.    The 1997 merger agreements and related documents did not divest the groups of insured Connecticut employees of their rights to compensation when Anthem Insurance demutualized. Nor did the merger documents transfer the rights to demutualization compensation away from the groups of insured employees and to the Connecticut Grandfathered Groups. Indeed, immediately prior to the 1997 merger between Anthem Insurance and BCBS-CT, the applicable Indiana insurance law and Anthem Insurance's (formerly Associated's) own membership rules did not recognize Indiana employers as the mutual members of Anthem Insurance with entitlements to demutualization compensation in the event Anthem Insurance demutualized.

149.    To the contrary, the 1997 merger agreements and related documents should be

37

construed and interpreted by this Court in a manner that preserves the insured Connecticut employee-groups' entitlements to demutualization compensation as such entitlements existed immediately prior to the merger.

150. Statements appearing at pages 14-15 of the *Information Circular* distributed by BCBS-CT to its members (attached hereto as Exhibit "O" and incorporated by reference herein) reveal an apparent misunderstanding of the membership rules in BCBS-CT's By-Laws for group health insurance policies:

> *Group policyholders of [BCBS-CT]*, on the other hand, *are members of [BCBS-CT]* and are entitled to one vote on all matters submitted to a vote of the members of [BCBS-CT]. *Group policyholders of [BCBS-CT] also possess certain proprietary rights in [BCBS-CT]*. The holders of certificates of benefits issued under [BCBS-CT's] group policies are not members of [BCBS-CT] and are not entitled to vote and do not have membership proprietary rights.
>
> In order *to preserve the existing voting and proprietary rights of [BCBS-CT's] group policyholders, [Anthem Insurance's] general practice regarding voting and other membership rights relating to group policies will not apply to the existing holders of group policies originally issued by [BCBS-CT]*. Instead, group holders of Guaranty Health Policies issued to existing groups as part of the Merger will be treated as members of [Anthem Insurance] and will have membership rights in [Anthem Insurance]. Accordingly, the rights of group holders of such Guaranty Health Policies will continue to include voting and proprietary rights as long as there is no lapse in coverage, but these rights will not be the same as the rights of most other holders of group policies issued by [Anthem Insurance] (who generally do not have either voting or proprietary rights in [Anthem Insurance]). (Emphasis supplied.)

151. These statements in the *Information Circular* reveal the intent to preserve membership interests and proprietary rights for Connecticut Grandfathered Groups (usually employers) that clearly did not exist under BCBS-CT's By-Laws before the merger. The groups of

insured employees were the Voting Members of BCBS-CT, not their employers.

152.    Since the 1997 merger agreements and related documents were prepared and executed by Anthem Insurance and BCBS-CT *based on an incorrect understanding* of BCBS-CT's pre-merger membership rules for group health insurance policies, this Court should interpret such provisions in the merger agreements and related documents in conformity with the By-Laws of BCBS-CT and preserve the employees' membership interests and rights to demutualization compensation that existed immediately prior to the 1997 merger.

I.    ANTHEM INSURANCE'S PLAN OF CONVERSION MISTAKENLY GRANTED MUTUAL MEMBERSHIP INTERESTS AND ENTITLEMENTS TO DEMUTUALIZATION COMPENSATION TO CERTAIN CONNECTICUT GROUP CONTRACT HOLDERS (GRANDFATHERED GROUPS).

153.    To compensate the members of Anthem Insurance for the loss of their mutual memberships and ownership interests upon demutualization, the Plan (Exhibit "A") provided that Anthem would issue to Anthem Insurance's former members either shares of Anthem common stock or cash. (Plan at Article I, "Manner of Conversion," Section 1.2(c)(ii); Article III, "Distribution of Consideration"; Article V, "Form and Amount of Consideration to be Distributed," Section 5.1; Article VI, "Payment of Consideration to Eligible Statutory Members," Section 6.1.)

154.    Article XII, "Additional Provisions," Sections 12.1(b) of the Plan set forth the membership rules that ostensibly applied to the group health insurance policies that had been issued by BCBS-CT before the 1997 merger with Anthem Insurance and were still in-force in 2001:

> Except as provided in Section 12.1(c), the *Holder of a Policy that is a group insurance policy* or group health care benefits contract *is the* Person or Persons specified in such Policy as *the policy or contract holder* unless no policy or contract holder is so specified, in which case the Holder is the Person (other than Anthem Insurance) on whose behalf the policy or contract was executed. (Emphasis supplied.)

155.    By reason of their status as group health insurance *contract holders*, the Plan's membership rules erroneously granted to certain Connecticut employers (Grandfathered Groups),

and simultaneously denied to the various groups of insured employees, the right to receive compensation upon the demutualization of Anthem Insurance. This erroneous provision in the Plan disregarded the membership rules in BCBS-CT's By-Laws that made the insured groups of employees the Voting Members of BCBS-CT.

156.    Section 12.1(b) of the Plan also cannot be reconciled with provisions found in the 1997 merger agreements and related documents that required BCBS-CT's group contract holders (usually employers) to be treated as though Anthem Insurance had issued group health insurance policies to them for purposes of determining both their membership interests and rights to demutualization compensation.

157.    As discussed above, the plain language of Section 3.1(B)(3) of PJAM-CT (Exhibit "K") explicitly applied Anthem Insurance's membership and equity rules to BCBS-CT's pre-merger group health policies. BCBS-CT's group contract holders were to be treated as though Anthem Insurance had issued them group health policies. Such treatment made the insured employees the mutual members of Anthem Associated, not the Connecticut Grandfathered Groups (usually employers). Section 3.1(B)(3) gave to the former BSBC-CT members:

> rights in the event of the ... demutualization of [Anthem Insurance] ... which rights are intended to be equivalent to the rights such person would have had *if such person had owned and insurance policy issued directly by [Anthem Insurance]* ...   (Emphasis supplied.)

158.    The Merger Agreement-CT (Exhibit "M") similarly applied Anthem Insurance's membership and equity rules to BCBS-CT's pre-merger group health insurance policies. Section 3.4(c) gave to BCBS-CT's former members:

> rights in the event of the ... demutualization of [Anthem Insurance] ... which rights are intended to be equivalent to the rights such person would have *if such person had owned an insurance policy*, or health care benefits contract *issued directly by [Anthem Insurance]* ...   (Emphasis supplied.)

159.    The *Information Circular* (Exhibit "O") repeated that after the merger with Anthem Insurance BCBS-CT's group contract holders (usually employers) were to be treated as though Anthem Insurance, instead of BCBS-CT, had issued group health insurance policies to them.   At page 11, the *Information Circular* provided:

> Under the Connecticut Merger Agreement, the former BCBS-CT members' interests in BCBS-CT will be preserved (transformed into equivalent interests in [Anthem Insurance]) and their future membership interests in Anthem Insurance will be equivalent to those they would have *if they owned an insurance policy or health care benefit contract issued directly by [Anthem Insurance]* ... (Emphasis supplied.)

160.    This Court should reform the provisions in the Plan that erroneously granted memberships in Anthem Insurance to the Connecticut Grandfathered Groups along with purported entitlements to demutualization compensation.   These Plan provisions demonstrate Anthem Insurance's misunderstanding of the membership rules in BCBS-CT's By-Laws for group health insurance policies.   These Plan provisions also reveal Anthem Insurance's apparent disregard for provisions in the 1997 merger agreements and related documents.   As described above, the 1997 merger agreements and related documents treat BCBS-CT's pre-merger group contract holders (usually employers) as though Anthem Insurance, instead of BCBS-CT, had issued to them group health policies.   Therefore, the Plan should have applied Anthem Insurance's rules to the Connecticut Grandfathered Groups for purposes of determining their future membership interests in Anthem Insurance and equity rights in the event of a demutualization.

J.    EACH CLASS MEMBER RECEIVED A SMALLER SHARE ALLOCATION BECAUSE OF THE MISALLOCATION OF ANTHEM SHARES TO GRANDFATHERED GROUPS IN OHIO AND CONNECTICUT.

161.    Approximately 10,565 Ohio and Connecticut Grandfathered Groups (usually employers) received approximately 19,800,000 shares of Anthem common stock to which they were not properly entitled.   Moreover, the aggregate number of Anthem shares misallocated to these Ohio

and Connecticut group contract holders far exceeded the number of shares, in the aggregate, that would have properly been allocated to the employees insured under the group health insurance policies issued by CMIC and BCBS-CT.

162.   A massive misallocation of Anthem shares to the Ohio and Connecticut Grandfathered Groups occurred because the share allocation for each group contract holder was based on the contribution to Anthem Insurance's surplus from its group health insurance policy during the period from January 1, 1990 through June 30, 2000, inclusive. (*See* Member Information Statement Part 1 ("*MIS-Part 1*") attached hereto as Exhibit "P" at A-40.)

163.   The contributions to surplus from each group health insurance policy took into account the group health insurance coverage for all employees insured during the period from January 1, 1990 through June 30, 2000, inclusive, not just the coverage for those employees that happened to have remained insured on June 18, 2001 and continuously thereafter through November 2, 2001, inclusive.

164.   To be eligible to receive demutualization compensation, the *MIS-Part 1* explained the Plan required the members of Anthem Insurance to have been insured on June 18, 2001, the date Anthem Insurance's Board of Directors approved the Plan, and to have remained insured through the effective date of the demutualization. (Exhibit "P" at 1, 21-22.)

165.   The Ohio and Connecticut Grandfathered Groups received credit in their respective Anthem share allocations *not solely* for the contributions to surplus attributable to those employees that were insured on June 18, 2001 and remained continuously insured through November 2, 2001, inclusive.

166.   The Ohio and Connecticut Grandfathered Groups improperly received credit in their Anthem share allocations for the contributions to surplus from insured employees that changed jobs, were fired or were laid-off without the continuation of their health insurance at any time after

January 1, 1990 but before November 2, 2001.

167.    The Ohio and Connecticut Grandfathered Groups improperly received credit in their Anthem share allocations for the contributions to surplus from those insured employees that died while insured at any time after January 1, 1990 but before November 2, 2001.

168.    The Ohio and Connecticut Grandfathered Groups improperly received credit in their Anthem share allocations for the contributions to surplus from those employees that had been switched from full-insurance coverage with Anthem Insurance or one of its three subsidiaries to self-insurance funded by an employer at any time after January 1, 1990 but before November 2, 2001.

169.    The Ohio and Connecticut Grandfathered Groups improperly received credit in their Anthem share allocations for the contributions to surplus from those employees whose health insurance coverage had been switched from Anthem Insurance or one of its three subsidiaries to another unrelated health insurer at any time after January 1, 1990 but before November 2, 2001.

170.    The Ohio and Connecticut Grandfathered Groups also improperly received credit in their Anthem share allocations for the contributions to surplus from those insured employees who retired at any time after January 1, 1990 but before November 2, 2001, and did not remain insured by Anthem Insurance or one of its three subsidiaries after they retired.

171.    One circumstance involving an Ohio Grandfathered Group illustrates both the misallocation of Anthem shares to a Grandfathered Group and the corresponding diminishment to the individual share allocations of Anthem Insurance's deserving members.

172.    In response to written interrogatories in a separate lawsuit, Cincinnati Bell Inc. ("Bell") (f/k/a Broadwing, Inc.) replied that only twenty-three (23) of its employees were fully insured on June 18, 2001 and remained continuously insured through November 2, 2001.

173.    On information and belief, Bell switched over 5,000 of its employees to self-insurance effective January 1, 2001. After the switch, Bell kept only 23 employees fully insured

with CIC (CMIC's successor in interest), a subsidiary of Anthem Insurance.

174.    In December 2001, Bell received 459,223 Anthem shares and sold these shares for approximately $23.4 million in January 2002. Bell's share allocation translated into approximately 19,966 Anthem shares for each of its 23 insured employees.

175.    The Anthem Defendants have admitted that 473 shares was the maximum number of shares allocated to any Anthem Insurance member who was an insured individual (as opposed to a group contract holder).

176.    If each of Bell's 23 insured employees had been entitled to the maximum allocation consisting of 473 shares, then 10,879 Anthem shares would have been properly allocated to them in the aggregate. Therefore, Anthem Insurance over-allocated at least 448,344 Anthem shares to Bell.

177.    Under the Plan, the entire value of Anthem Insurance was distributed to its members by the allocation of a fixed and finite number of Anthem shares, set at 100 million shares (subject to a slight upward adjustment for rounding).

178.    Therefore, the massive misallocation of Anthem shares to the Ohio and Connecticut Grandfathered Groups had the corresponding effect of proportionately reducing the share allocations for all deserving members of Anthem Insurance.

179.    On information and belief, Anthem Insurance allocated to the Ohio and Connecticut Grandfathered Groups millions of Anthem shares over and above the number of shares that were properly allocable to their employees who were insured on June 18, 2001 and continuously through November 2, 2001, inclusive. This massive misallocation of Anthem shares to the Ohio and Connecticut Grandfathered Groups reduced the share allocations of all Anthem Insurance's deserving members by the same number of shares in the aggregate.

180.    As a result of the misallocation of Anthem shares to only one of the Grandfathered Groups, Bell, the deserving members of Anthem Insurance each received proportionately smaller

share allocations and were underallocated at least 448,344 shares in the aggregate.

181.    To properly compensate the deserving members of Anthem Insurance, these 448,344 Anthem shares must be "poured-back" into their originally insufficient share allocations.

182.    In a separate action styled *Ormond v. Anthem, Inc.*, Case No. 1:05-CV-01908-DFH-TAB, currently pending in the Southern District of Indiana, this "pour-back" of Anthem shares has been requested as a means to properly compensate those members of Anthem Insurance that were paid cash as their demutualization compensation.

183.    On account of Anthem Insurance having misallocated millions of Anthem shares to the Ohio and Connecticut Grandfathered Groups, Plaintiff and each Class member received proportionately smaller share allocations. In the aggregate, millions of Anthem shares were under-allocated to the Class members.

184.    In December 2001, Anthem issued its shares to the former members of Anthem Insurance based on the number of shares allocated to each former member. As a result of this class-wide under-allocation of shares, Plaintiff and the other Class members have been damaged because each received proportionately fewer Anthem shares.

K.    THE ANTHEM DEFENDANTS IMPROPERLY DILUTED THE VALUE OF THE CLASS MEMBERS' EQUITY INTERESTS BY ISSUING THREE MILLION MORE ANTHEM SHARES THAN HAD BEEN LAST DISCLOSED TO ANTHEM INSURANCE'S MEMBERS.

185.    The 2001 Annual Report and Form 10-K filed by Anthem with the SEC on March 25, 2002, reported that there were 103,295,675 outstanding shares of Anthem common stock immediately following the IPO and demutualization. With the additional shares sold upon exercise of the underwriter's "green shoe" option on or about October 31, 2001, the Anthem IPO sold 55,200,000 shares. Another 48,095,675 Anthem shares were issued as stock compensation to the members.

186.    The 2001 Annual Report and Form 10-K also disclosed that $2,063,600,000 in cash

had been paid to the members of Anthem Insurance as their demutualization compensation. The members of Anthem Insurance were paid $39.60 in cash for each of their shares. The Anthem Insurance members that had been paid cash were allocated approximately 52,111,111 shares in the aggregate.

187.    Collectively, the members of Anthem Insurance had been allocated only 100,206,786 of the 103,295,675 outstanding Anthem shares. Therefore, Plaintiff and the Class members had their respective equity interests diluted by approximately three percent (3%).

188.    On account of the dilution of their equity interests, Plaintiff and the Class members received Anthem shares in late December 2001 that were worth approximately three percent (3%) less than the shares would have been worth without the dilution. Plaintiff and the Class members have been damaged due to the dilution of their equity interests. Moreover, the dilution also caused a future injury to Plaintiff and the other Class members. They lost three percent (3%) of any future appreciation in their Anthem shares.

189.    There were 55,200,000 Anthem shares sold in the IPO, but only 52,111,111 shares had been allocated to those Anthem Insurance members that received cash as their demutualization compensation. The three percent (3%) dilution was caused by Anthem's sale of over 3,000,000 more of its shares in the IPO than were redeemed from the members of Anthem Insurance by cash payments. The dilution would not have occurred had the number of shares sold in the IPO been equal to the number of shares allocated to the members that received cash.

L.    THE STATUTE OF LIMITATIONS HAS NOT EXPIRED.

190.    This Complaint has been filed less than one year after Plaintiff's discovery of the facts constituting the violations and the other bases for the claims he asserts in this Complaint.

### First Claim for Relief
### (Breach of Contract by Anthem and Anthem Insurance)

191.     Plaintiff realleges and incorporates by reference the allegations set forth in Paragraphs One (1) through One Hundred Eighty-four (184), inclusive, and One Hundred Ninety (190) above as if the same were fully rewritten herein.

192.     The relationship between a member of a mutual insurance company and the mutual company itself is contractual in nature as the result of an express or implied contract between them.

193.     Pursuant to the relevant provisions of the Indiana Code, including without limitation IC 27-15-2-2, a mutual insurance company, like Anthem Insurance, that intends to demutualize and convert to a stock corporation must pay consideration to all its eligible members that is fair, reasonable, equitable and adequate.

194.     The obligation to pay fair, reasonable, equitable and adequate consideration to eligible members in exchange for their respective membership interests is incorporated by law into the terms of the member's written contract with the mutual insurance company.

195.     Anthem Insurance's statutory and common law obligations to pay fair, reasonable, equitable and adequate consideration to its eligible members in exchange for their membership interests in connection with a demutualization transaction arises from a number of sources, including without limitation (i) the contractual relationship between member and mutual insurance company as set forth in corporate articles, bylaws, certain merger agreements and other relevant documents, (ii) well-established business practices, (iii) prior course of dealings the members and the mutual insurance company, (iv) applicable insurance laws that are expressly or implicitly incorporated into the various agreements and contracts that exist between the member and the mutual insurance company, and (v) the settled expectations of the parties.

196.     By operation of law, Anthem Insurance's obligation to pay fair, reasonable, equitable and adequate consideration to Plaintiff and the Class members has been incorporated into the terms

of the express or implied written contract between Anthem Insurance and its members, regardless of whether it is specifically stated as such therein.

197.    Anthem's and Anthem Insurance's contractual obligation to pay fair, reasonable, equitable and adequate consideration to Plaintiff and the Class members also derives from the Plan adopted by Anthem Insurance's Board of Directors on June 18, 2001, and approved by the members on October 29, 2001.

198.    Anthem and Anthem Insurance have breached their contractual obligations to Plaintiff and the Class members by failing to pay them fair, reasonable, equitable and adequate demutualization compensation in exchange for their membership interests.

199.    Anthem's and Anthem Insurance's breaches of contract caused Plaintiff and the Class members to receive significantly less than fair, reasonable, equitable and adequate demutualization compensation in exchange for membership interests.

200.    As a direct and proximate result of Anthem's and Anthem Insurance's breaches of contract, Plaintiff and the Class members have been damaged because they received fewer shares and less value than that which constituted fair, reasonable, equitable and adequate value in exchange for their membership interests, in an aggregate amount not less than $250,000,000 to be determined from the evidence in accordance with law, and in individual amounts that can be calculated for Plaintiff and each Class member on a class-wide basis.

201.    Anthem and Anthem Insurance are jointly and severally liable for the foregoing damages.

## Second Claim for Relief
### (Breach of PJAM-OH Contract by Anthem Insurance)

202.    Plaintiff realleges and incorporates by reference the allegations set forth in Paragraphs One (1) through One Hundred Eighty-four (184), inclusive, and One Hundred Ninety (190) above as if the same were fully rewritten herein.

203.    Associated (later Anthem Insurance) and CMIC (later CIC) entered into and executed PJAM-OH (Exhibit "E"), a written contract.  Plaintiff and the Class members were intended third-party beneficiaries of PJAM-OH.  Relevant provisions in PJAM-OH conferred upon Plaintiff and the Class members mutual membership interests in Anthem Insurance and equity rights in the event Anthem Insurance later demutualized.

204.    The demutualization rights, if any, granted to Ohio Grandfathered Groups in Article III, Section 3.1(B)(3) of PJAM-OH were intended and specified to be only equivalent to the rights the Ohio Grandfathered Groups would have had if Associated, instead of CMIC, had issued the group health insurance policies directly to the Ohio Grandfathered groups.  PJAM-OH further specified that the demutualization rights of the Ohio Grandfathered Groups included the full value of their interests, if any, in CMIC immediately prior to the 1995 merger.

205.    If Associated had issued group health insurance policies directly to the Ohio Grandfathered Groups, these Ohio Grandfathered Groups would have had no rights or entitlements to compensation upon the demutualization of Anthem Insurance.  Under Associated's (later Anthem Insurance's) membership rules, employers that sponsored group health insurance policies covering their employees were not members of the mutual insurance company.  Under Associated's (later Anthem Insurance's) membership rules, the employees were the mutual members.  Therefore, employers had no rights or entitlements as mutual members under Associated's membership rules and Indiana insurance law to compensation in the event Associated (later Anthem Insurance) demutualized.

206.    Moreover, in the event CMIC had demutualized immediately prior to the 1995 merger, the value of the interests of the Ohio Grandfathered Groups was zero because, under the applicable Ohio demutualization statute, the insured employees were the *policyholders* (defined as the persons insured or members of the insured group of persons) entitled to stock compensation in

the event CMIC demutualized. The Ohio Grandfathered Groups had no pre-merger rights or entitlements under Ohio law to demutualization compensation.

207.    Section 3.1(B)(3) of PJAM-OH also specified that the demutualization rights, if any, of the Ohio Grandfathered Groups were set forth in Associated's Second Amended Articles (Exhibit "F"). Article VIII, Section 8.3 of the Second Amended Articles provided that, upon Associated's (later Anthem Insurance's) demutualization, the Ohio Grandfathered Groups were entitled to the same value calculated under Ohio law as though a demutualization of CMIC had occurred immediately prior to the 1995 merger. The Ohio Grandfathered Groups were entitled to zero value for any purported membership or equity interests they may have had in CMIC since the insured employees were the *policyholders* entitled to compensation in the event CMIC had demutualized immediately prior to the 1995 merger.

208.    As intended third-party beneficiaries of PJAM-OH, Plaintiff and the Class members have standing to bring this claim for breach of PJAM-OH against Anthem Insurance.

209.    Anthem Insurance breached the PJAM-OH by erroneously misallocating and issuing approximately 15 million Anthem shares to Ohio Grandfathered Groups in December 2001 following Anthem Insurance's demutualization, instead of properly allocating and issuing millions of such shares proportionately to and among Plaintiff and the Class members.

210.    The breaches of PJAM-OH by Anthem Insurance caused Plaintiff and the Class members to receive fewer Anthem shares and less share value than they were contractually and legally entitled upon the demutualization of Anthem Insurance.

211.    As a direct and proximate result of the breaches of contract by Anthem Insurance, the Plaintiff and the other members of the Class have been damaged in the aggregate amount of not less than $250,000,000 to be determined from the evidence in accordance with law, and in individual amounts that can be calculated for Plaintiff and each Class member on a class-wide basis.

**Third Claim for Relief**
<u>(Breach of PJAM-CT Contract by Anthem Insurance)</u>

212.    Plaintiff realleges and incorporates by reference the allegations set forth in Paragraphs One (1) through One Hundred Eighty-four (184), inclusive, and One Hundred Ninety (190) above as if the same were fully rewritten herein.

213.    Anthem Insurance and BCBS-CT entered into and executed PJAM-CT (Exhibit "K"), a written contract. Plaintiff and the Class members were intended third-party beneficiaries of PJAM-CT. Relevant provisions of PJAM-CT conferred upon Plaintiff and the Class members mutual membership interests in Anthem Insurance and equity rights in the event Anthem Insurance later demutualized.

214.    At Article III, Section 3.1(B)(1), PJAM-CT conferred membership interests in Anthem Insurance to the former members of BCBS-CT. Under the membership rules for group health insurance policies in BCBS-CT's By-Laws (Exhibit "J"), the Voting Members of BCBS-CT immediately before the 1997 merger with Anthem Insurance were the groups of insured employees, not their employers (the Connecticut Grandfathered Groups).

215.    Anthem Insurance breached PJAM-CT by granting membership interests and equity rights in the event Anthem Insurance demutualized to the Connecticut Grandfathered Groups rather than to their insured groups of employees.

216.    The demutualization rights, if any, granted to Connecticut Grandfathered Groups in Article III, Section 3.1(B)(3), of PJAM-CT were intended and specified to be only equivalent to the rights the Connecticut Grandfathered Groups would have had if Anthem Insurance, instead of BCBS-CT, had issued the group health insurance policies directly to the Connecticut Grandfathered Groups. PJAM-CT further specified that the demutualization rights of the Connecticut Grandfathered Groups included the full value of their interests, if any, in BSBC-CT immediately prior to the 1997 merger.

217. If Anthem Insurance had issued group health insurance policies directly to the Connecticut Grandfathered Groups, these Connecticut Grandfathered Groups would have had no rights or entitlements to compensation upon the demutualization of Anthem Insurance. Under Anthem Insurance's (previously Associated's) membership rules, employers that sponsored group health insurance policies covering their employees were not members of the mutual insurance company. Under Anthem Insurance's membership rules, the employees were the mutual members. Therefore, employers had no rights or entitlements as mutual members under Anthem Insurance's membership rules and Indiana insurance law to compensation in the event Anthem Insurance demutualized.

218. Moreover, in the event BCBS-CT had demutualized immediately prior to the 1997 merger, the value of the interests of the Connecticut Grandfathered Groups was zero because, under BCBS-CT's By-Laws, the insured groups of employees were BCBS-CT's Voting Members entitled to compensation in the event BCBS-CT demutualized. The Connecticut Grandfathered Groups had no pre-merger rights or entitlements under the By-Laws to demutualization compensation.

219. As intended third-party beneficiaries of PJAM-CT, Plaintiff and the Class members have standing to bring this claim for breach of PJAM-CT against Anthem Insurance.

220. Anthem Insurance breached PJAM-CT by erroneously misallocating and issuing approximately 4.8 million Anthem shares to Connecticut Grandfathered Groups in December 2001, instead of properly allocating and issuing millions of such shares proportionately to and among Plaintiff and the Class members.

221. Anthem Insurance's breaches of PJAM-CT caused Plaintiff and the Class members to receive fewer Anthem shares and less share value than they were contractually and legally entitled to upon the demutualization of Anthem Insurance.

222. As a direct and proximate result of Anthem Insurance's breaches of contract, Plaintiff

and the Class members have been damaged in the aggregate amount of not less than $250,000,000 to be determined from the evidence in accordance with law, and in individual amounts that can be calculated for Plaintiff and each Class member on a class-wide basis.

### Fourth Claim for Relief
(Breach of Anthem Insurance's Articles of Incorporation)

223.    Plaintiff realleges and incorporates by reference the allegations set forth in Paragraphs One (1) through One Hundred Eighty-four (184), inclusive, and One Hundred Ninety (190) above as if the same were fully rewritten herein.

224.    The Articles of Incorporation of Anthem Insurance represents a written contract between Anthem Insurance and its mutual members.  Plaintiff and the Class members were former members of Anthem Insurance.  The Second Amended Articles (Exhibit "F") and Third Amended Articles (Exhibit "L") granted to Plaintiff and the Class members mutual membership interests in Anthem Insurance and equity rights in the event of a demutualization.

225.    Article VII of the Second Amended Articles, Section 7.3(b), provided that the former members of CMIC became mutual members of Associated (later Anthem Insurance) following the 1995 merger.  Article VII of the Third Amended Articles, at Section 7.4, similarly provided that the former members of CMIC became members of Anthem Insurance.

226.    Under the relevant provisions of Ohio insurance law as set forth in R.C. 3913.20(B), 3913.22(A) and 3913.22(D), in effect immediately before the 1995 merger, the individual insured employees had ownership rights and equity interests in CMIC.  At least for demutualization purposes, the individual insured employees were the mutual members of CMIC, not their employers, the Ohio Grandfathered Groups.

227.    Article VIII, at Section 8.3, in both the Second and Third Amended Articles provided the former members of CMIC with rights to demutualization compensation in the event Associated (later Anthem Insurance) demutualized after the 1995 merger.

228.   The Second and Third Amended Articles provided that, upon a demutualization of Anthem Insurance, the Ohio Grandfathered Groups (to the extent they were former CMIC members) were entitled to the same value calculated under Ohio law as though a demutualization of CMIC had occurred immediately prior to the 1995 merger.

229.   The Ohio Grandfathered Groups were entitled to zero value for any purported membership or equity interests they may have had in CMIC because the insured employees were the *policyholders* under the Ohio demutualization statute with entitlements to compensation in the event CMIC had demutualized prior to the 1995 merger.

230.   As former members of Anthem Insurance, Plaintiff and the Class members have standing to bring such breach of contract claims against Anthem Insurance.

231.   Anthem Insurance breached its contractual obligations under the Second and Third Amended Articles by misallocating and issuing approximately 15 million Anthem shares to Ohio Grandfathered Groups instead of properly allocating and issuing millions of such shares proportionately to and among Plaintiff and the Class members.

232.   Article VII of the Third Amended Articles, at Section 7.6(b)(2), provided that the former members of BCBS-CT became mutual members of Anthem Insurance following the 1997 merger.

233.   Under the membership rules for group health insurance policies in BCBS-CT's By-Laws (Exhibit "J"), the insured groups of employees were BCBS-CT's Voting Members, not the Connecticut Grandfathered Groups (their employers).

234.   Anthem Insurance breached its Third Amended Articles by granting membership interests in Anthem Insurance to the Connecticut Grandfathered Groups rather than to the insured groups of employees.

235.   Article VIII, at Section 8.4, of the Third Amended Articles provided the former

members of BCBS-CT with rights to demutualization compensation in the event Anthem Insurance demutualized after the 1997 merger.

236. The Connecticut Grandfathered Groups were not members of BCBS-CT before the 1997 merger. Therefore, the Connecticut Grandfathered Groups were not provided rights under the Third Amended Articles to demutualization compensation in the event Anthem Insurance demutualized.

237. The Third Amended Articles provided that upon a demutualization of Anthem Insurance the former members of BCBS-CT were entitled to the same value calculated under Connecticut law as though a demutualization of BCBS-CT had occurred immediately prior to the 1997 merger.

238. The Connecticut Grandfathered Groups were entitled to zero value because the insured groups of employees were the Voting Members of BCBS-CT under its By-Laws with entitlements to compensation in the event BCBS-CT had demutualized prior to the 1997 merger.

239. Anthem Insurance breached its contractual obligations under the Third Amended Articles by misallocating and issuing approximately 4.8 million Anthem shares to Connecticut Grandfathered Groups, instead of properly allocating and issuing millions of such shares proportionately to and among Plaintiff and the Class members.

240. Anthem Insurance's breaches of the Second and Third Amended Articles caused Plaintiff and the Class members to receive fewer Anthem shares and less share value than they were contractually and legally entitled to upon the demutualization of Anthem Insurance.

241. As a direct and proximate result of Anthem Insurance's breaches of the Second and Third Amended Articles, Plaintiff and the Class members have been damaged in the aggregate amount of not less than $250,000,000 as will be determined from the evidence in accordance with law, and in individual amounts that can be calculated for Plaintiff and each Class member on a class-

wide basis.

**Fifth Claim for Relief**
(Breach of the Plan of Conversion by Anthem and Anthem Insurance)

242.     Plaintiff reallges and incorporates by reference the allegations set forth in Paragraphs One (1) through One Hundred Eighty-four (184), inclusive, and One Hundred Ninety (190) above as if the same were fully rewritten herein.

243.     The Plan (Exhibit "A") provided the former members of Anthem Insurance with rights to compensation in the form of stock or cash upon the demutualization of Anthem Insurance. Anthem and Anthem were obligated under the Plan to pay fair, reasonable, equitable and adequate compensation to the eligible members of Anthem Insurance in exchange for their membership interests.

244.     The Plan represents a written contract among Anthem, Anthem Insurance and the former members of Anthem Insurance.

245.     As former members of Anthem Insurance, Plaintiff and the Class members have standing to bring such breach of contract claims against Anthem and Anthem Insurance.

246.     Anthem and Anthem Insurance inserted provisions into the Plan that improperly conferred upon the Ohio and Connecticut Grandfathered Groups membership interests in Anthem Insurance and rights to demutualization compensation.

247.     These improper provisions were contrary to (i) the Ohio demutualization statute that provided equity and demutualization rights to the employees insured under CMIC's pre-merger group health insurance policies, (ii) provisions in the 1995 merger agreements and related documents executed by and between Associated and CMIC that specified the group health policies issued to Ohio Grandfathered Groups were to be treated as though Associated had issued the policies directly to the Ohio Grandfathered Groups, (iii) the membership rules for group health insurance policies in BCBS-CT's By-Laws that made insured groups of employees the Voting Members of BCBS-CT,

and (iv) provisions in the 1997 merger agreements and related documents executed by and between Anthem Insurance and BCBS-CT that specified the group health policies issued to Connecticut Grandfathered Groups were to be treated as though Anthem Insurance had issued the policies directly to the Connecticut Grandfathered Groups.

248.    The insertion of such improper provisions into the Plan resulted in the misallocation and issuance of approximately 15 million Anthem shares to Ohio Grandfathered Groups and approximately 4.8 million Anthem shares to Connecticut Grandfathered Groups.

249.    The insertion of such improper provisions into the Plan also resulted in the under-allocation of millions of Anthem shares in the aggregate to Plaintiff and the Class members.

250.    By inserting such improper provisions into the Plan, Anthem and Anthem Insurance breached their contractual obligations under the Plan to pay fair, reasonable, equitable and adequate compensation to Plaintiff and the Class members in exchange for their membership interests.

251.    Anthem and Anthem Insurance diluted the equity interests of Plaintiff and the Class members by approximately three percent (3%).  By diluting such equity interests, Anthem and Anthem Insurance breached their contractual obligations under the Plan to pay fair, reasonable, equitable and adequate compensation to Plaintiff and the Class members in exchange for their membership interests.

252.    The breaches of the Plan by Anthem and Anthem Insurance caused Plaintiff and the Class members to receive fewer Anthem shares and less share value than they were contractually and legally entitled to upon the demutualization of Anthem Insurance.

253.    As a direct and proximate result of the breaches of the Plan by Anthem and Anthem Insurance, Plaintiff and the Class members have been damaged in the aggregate amount of not less than $250,000,000 as will be determined from the evidence in accordance with law, and in individual amounts that can be calculated for Plaintiff and each Class member on a class-wide basis.

254.    Anthem and Anthem Insurance are jointly and severally liable for the foregoing damages.

**Sixth Claim for Relief**
(Breach of Fiduciary Duties by Anthem Insurance)

255.    Plaintiff realleges and incorporates by reference the allegations set forth in Paragraphs One (1) through One Hundred Ninety (190), inclusive, above as if the same were fully rewritten herein.

256.    Anthem Insurance owed certain fiduciary duties to Plaintiff and the Class members, including without limitation the fiduciary duties of due care, loyalty, good faith and fair dealing with respect to their membership interests, the IPO and demutualization transactions, and the conversion of Anthem Insurance from a mutual insurance company to a stock company.

257.    Specifically, Anthem Insurance had a fiduciary duty to properly allocate a sufficient number of Anthem shares to Plaintiff and the Class members to ensure that they each received fair, reasonable, equitable and adequate compensation in exchange for their membership interests. Anthem Insurance also had a fiduciary duty not to dilute the equity interests of its members.

258.    By improperly misallocating Anthem shares to persons with no rights or entitlements to demutualization compensation, it was foreseeable to Anthem Insurance that the Plaintiff and the other Class members would each receive an inadequate number of Anthem shares.

259.    By selling approximately 3,000,000 more Anthem shares in the IPO than were allocated to those Anthem Insurance members that were paid cash as their demutualization compensation, it was foreseeable to Anthem Insurance that the equity interests of the Plaintiff and the other Class members would be diluted.

260.    Anthem Insurance breached its fiduciary duties owed to Plaintiff and the Class members by misallocating approximately 19,800,000 Anthem shares to Ohio and Connecticut Grandfathered Groups that were not contractually or legally entitled to any demutualization

compensation, instead of properly allocating millions of such shares proportionately to and among Plaintiff and the Class members.

261.    Anthem Insurance also breached its fiduciary duties to Plaintiff and the Class members by diluting their equity interests.

262.    As former members of Anthem Insurance, Plaintiff and the Class members have standing to assert such breach of fiduciary duty claims against Anthem Insurance.

263.    Anthem Insurance's breaches of fiduciary duties caused Plaintiff and the Class members to receive fewer Anthem shares and less share value than they were entitled to receive upon the demutualization of Anthem Insurance.

264.    As a direct and proximate result of Anthem Insurance's breaches of its fiduciary duties, Plaintiff and the Class members have been damaged in the aggregate amount of not less than $250,000,000 as will be determined from the evidence in accordance with law, and in individual amounts that can be calculated for Plaintiff and each Class member on a class-wide basis.

### Seventh Claim for Relief
#### (Negligence by Anthem and Anthem Insurance)

265.    Plaintiff realleges and incorporates by reference the allegations set forth in Paragraphs One (1) through One Hundred Ninety (190), inclusive, above as if the same were fully rewritten herein.

266.    Anthem and Anthem Insurance owed a duty, jointly and severally, to Plaintiff and the Class members to exercise reasonable due care and to properly allocate a sufficient number of Anthem shares to Plaintiff and the Class members to ensure that each received fair, reasonable, equitable and adequate compensation in exchange for their respective membership interests.

267.    Anthem and Anthem Insurance negligently failed to exercise reasonable care by misallocating approximately 19,800,000 Anthem shares to Ohio and Connecticut Grandfathered Groups that were not contractually or legally entitled to any demutualization compensation, instead

of properly allocating millions of such shares proportionately to and among Plaintiff and the Class members.

268.    By improperly misallocating Anthem shares to persons with no rights or entitlements to demutualization compensation, it was foreseeable to Anthem and Anthem Insurance that Plaintiff and the Class members would each receive an inadequate number of Anthem shares.

269.    By selling approximately 3,000,000 more Anthem shares in the IPO than were allocated to those Anthem Insurance members that were paid cash as their demutualization compensation, it was foreseeable to Anthem and Anthem Insurance that the equity interests of the Plaintiff and the Class members would be diluted.

270.    As former members of Anthem Insurance, Plaintiff and the Class members have standing to assert these negligence claims against Anthem and Anthem Insurance.

271.    Anthem's and Anthem Insurance's failures to exercise reasonable due care when allocating the Anthem shares and selling the IPO shares caused Plaintiff and the Class members to receive fewer Anthem shares and less share value than they were entitled to receive upon the demutualization of Anthem Insurance.

272.    As a direct and proximate result of Anthem's and Anthem Insurance's failures to exercise reasonable care when allocating Anthem shares and selling the IPO shares, Plaintiff and the Class members have been damaged in the aggregate amount of not less than $250,000,000 as will be determined from evidence in accordance with law, and in individual amounts that can be calculated for Plaintiff and each Class member on a class-wide basis.

273.    Anthem and Anthem Insurance are jointly and severally liable for the foregoing damages.

WHEREFORE, Plaintiff, Jeffrey D. Jorling, on behalf of himself and the other members of the Class, hereby demands judgment in his favor against Defendants, Anthem and Anthem

Insurance, and each of them, jointly and severally, and prays that the Court:

1.     Issue an Order certifying the case as a class action, pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, and certifying the Class as alleged and defined herein.

2.     Order Anthem and Anthem Insurance to provide the Class members with an accounting of the Anthem shares allocated and issued to Ohio and Connecticut Grandfathered Groups.

3.     Grant preliminary and permanent injunctive relief in favor of Plaintiff and the Class members in the form of Orders requiring Defendants, and each of them, to conform their conduct to the terms of the specific performance order prayed for above.

4.     Declare whether the holders of group health insurance contracts (Kentucky Grandfathered Groups) issued by Southeastern prior to its 1993 merger with Associated and still in-force at the Effective Date were properly entitled to demutualization compensation.

5.     Award Plaintiff and the Class members compensatory damages to be paid by Defendants and each of them, jointly and severally, with respect to each claim for relief in amounts not less than $250,000,000 to be determined from the evidence in accordance with law.

6.     Award Plaintiff and the Class members their costs and expenses of this action, including reasonable attorneys' fees, together with pre-judgment and post-judgment interest at the maximum rate allowed by law.

7.     Grant such other and further relief as the Court may deem just and proper.


Eric H. Zagrans (Ohio Bar No. 0013108)
ZAGRANS LAW FIRM LLC
474 Overbrook Road
Elyria, Ohio 44035
(440) 452-7100  (telephone)
eric@zagrans.com  (e-mail)

and

Dennis P. Barron  (Ohio Bar No. 0030568)
582 Torrence Lane
Cincinnati, Ohio 45208
(513) 871-2369  (telephone)
DennisPBarron@aol.com  (e-mail)

and

Michael F. Becker (Ohio Bar No. 0008298)
BECKER & MISHKIND CO., L.P.A.
1660 West 2nd St., Suite 660
Cleveland, Ohio 44113
(216) 241-2600  (telephone)
mbecker@beckermishkind.com  (e-mail)

*Attorneys for Plaintiffs*

## JURY DEMAND

Plaintiff hereby demands a trial by jury, pursuant to Rule 38 of the Federal Rules of Civil

Procedure, on all issues so triable.

Eric H. Zagrans