UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

JEFFREY D. JORLING, On Behalf of Himself  )
and Others Similarly Situated,                        )
                    Plaintiff,                           )
                                         )
        vs.                                       )        1:09-cv-798-TWP-TAB
                                         )
ANTHEM, INC., (n/k/a Wellpoint, Inc.) and    )
ANTHEM INSURANCE COMPANIES, INC.,  )
              Defendant.                         )
                                       )

## ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

        This matter is before the Court on Defendants' Motion For Summary Judgment.[1]  This

class action lawsuit arises out of the demutualization of Anthem Insurance Companies, Inc.

("Anthem"), a transaction which involved two steps.  First, Anthem's members liquidated their

ownership interest in the mutual company in exchange for either stock or cash.  Second, Anthem

transformed into a publicly-traded company through an initial public offering ("IPO") of shares

in Anthem, Inc. (Anthem's new parent company).  Notably, this lawsuit  is a companion to

another lawsuit that has been pending before the Court since 2005: *Mary E. Ormond, et al. v.*

*Anthem, Inc. and Anthem Insurance Companies, Inc.*, 1:05-cv-01908- TWP-TAB.  The main

difference between the two lawsuits is the *type* of compensation received by the former mutual

members.  The *Ormond* plaintiffs received cash; by contrast, Jeffrey Jorling and the proposed

class received stock.  Despite this difference, the crux of the two lawsuits is the same: plaintiffs

---

[1]Throughout this entry, the Court will, for simplicity sake, occasionally use "Anthem" interchangeably with "Defendants."

allege they were inadequately compensated for their ownership interests in Anthem.

The genesis of this lawsuit can be traced to a ruling in *Ormond*. Specifically, on January 12, 2009, the *Ormond* plaintiffs were allowed to file a Fourth Amended Complaint; however, Judge Hamilton denied an amendment seeking to add a claim asserting that Defendants breached their obligations and duties to those members who elected to receive *stock*. On June 26, 2009, Jeffrey Jorling filed a complaint in this case.

On July 1, 2011, this Court issued a ruling on summary judgment in *Ormond*, allowing the plaintiffs' claims for breach of duty in connection with the pricing and sizing of the IPO to survive for trial, but granting summary judgment on all remaining claims. Despite its many shared similarities with *Ormond*, this case has distinguishing features. For the reasons explained below, Defendants' Motion for Summary Judgment [Dkt. 138] is **GRANTED**.

## I. BACKGROUND[2]

### A.     Factual Background

Anthem demutualized in 2001, two years after Indiana adopted a new statutory scheme governing the demutualization of insurance companies. Specifically, the demutualization statutes allow an Indiana mutual insurance company to convert to a stock company through a plan of conversion, which must be proposed to and approved by both the State's Commissioner of Insurance ("Commissioner") and two-thirds of the company's membership. Ind. Code § 27-15-1-2 *et seq*. The Commissioner and the Indiana Department of Insurance ("IDOI") are tasked with gathering the expertise and information necessary to reach conclusions regarding: (1) the

---

[2]Parts of the factual background of this case should look familiar to the parties. Given the significant factual overlap between this case and *Ormond* and for the sake of judicial efficiency, the Court borrowed liberally from the background section in its July 1, 2011 entry on summary judgment in *Ormond*.

fairness of the amount and form of consideration to be distributed to the members, both in the aggregate and individually; (2) the compliance of the plan with applicable state laws; (3) the overall fairness, reasonableness, and equity of the plan to the members; (4) whether policyholders would be prejudiced by a conversion; and (5) whether the total consideration provided to extinguish the member's interests is equal to or greater than the surplus of the converting mutual company. Ind. Code § 27-15-4-8.  A public hearing is required and if the Commissioner reaches a favorable conclusion regarding these five issues, she must approve the plan.  If a conversion plan is approved by the Commissioner, it is then submitted to the membership for an approval vote. Ind. Code § 27-15-5-1.

Anthem Insurance is the product of numerous mergers, acquisitions, and name changes. The company history began with a merger of two Indiana mutual insurance companies which formed Associated Insurance Companies, Inc. ("Associated").  Associated's bylaws provided that its membership would be comprised solely of individuals, regardless of whether the individual held a personal policy or was enrolled as a certificate holder in a group plan. Associated then merged with a Kentucky mutual insurance company, Southeastern Mutual Insurance Company ("Southeastern"), and an Ohio mutual insurance company, Community Mutual Insurance Company ("CMIC"). Both companies had bylaws defining their memberships as being comprised of individuals who were insured under individual insurance policies and those entities or groups as a whole that had purchased group policies.  Therefore, unlike Associated's bylaws, under the bylaws of Southeastern and CMIC,  the individuals who were the certificate holders or insured persons under group policies did not obtain membership status.

In order to protect the rights of those entities that had obtained membership through the

purchase of the group policies from Southeastern and CMIC,  a "Grandfather" clause was placed in the merger documents.  This clause allowed those group policy purchasers (typically employers) with a pre-existing membership status to become members of Associated, so long as their insurance policies or healthcare benefits and services contracts remained in effect or were renewed, amended, or replaced without a lapse in coverage.  However, new group customers (again typically employers) in Kentucky or Ohio that entered into group contracts with Associated for the first time *post-merger* did not become members.  Instead, pursuant to Associated's bylaws, the individual enrollees under those post-merger group policies became members.

After those two mergers, Associated changed its name to Anthem Insurance.  In 1997, Anthem merged with Blue Cross & Blue Shield of Connecticut, Inc. ("BCBS Connecticut"), a Connecticut mutual insurance company whose bylaws defined its membership in a manner similar to the way the merged Kentucky and Ohio companies had defined their memberships. Specifically, in the case of group polices, the "group as a whole" was recognized as a member (as opposed to each individual insured or certificate holder under a group policy).  As with the prior mergers, Anthem preserved the rights of the BCBS Connecticut holders of group policies or "group as a whole" members by having them become members of Anthem Insurance, so long as the group insurance policies or healthcare benefits contracts remained in effect or were renewed, amended, or replaced without a lapse in coverage.  Thus, by the time of Anthem Insurance's demutualization in 2001, it had a patchwork of members, including: (1) "Grandfathered Groups" in Kentucky, Ohio, and Connecticut; (2) individuals insured under group policies in Kentucky, Ohio, and Connecticut that were issued to new groups after the

Kentucky, Ohio, and Connecticut mergers took place; and (3) persons insured under individual insurance policies in Kentucky, Ohio, and Indiana.

Anthem embarked on the demutualization process through a resolution of its Board of Directors passed on June 18, 2001. However, prior to the adoption of the resolution, Anthem and the IDOI communicated regarding Anthems intent to demutualize. The IDOI reviewed and commented on a draft demutualization plan. Anthem employed Goldman Sachs & Co. as its financial advisor and sought assistance from other qualified accounting, actuarial, and legal experts to assist in putting together and, if passed, executing the conversion plan. On June 21, 2001, Anthem formally submitted its application for approval of a final plan of conversion (the "Plan"). At the request of the IDOI, the application was supplemented with more detail in July 2001, and the IDOI deemed the application complete on August 18, 2001.

The Plan required that the aggregate amount of consideration distributed to eligible members be equal to the "fair value" of Anthem at the time of the conversion. Article IV of the Plan set forth the manner in which Anthem would seek to determine fair value.

## Article IV

Anthem Insurance has, with the assistance of its Financial Advisor and other advisors retained in connection with the Conversion and Public Offering, structured the Conversion and proposed Public Offering to provide fair value to the Eligible Statutory Members, and this Plan provides for Eligible Statutory Members to receive aggregate consideration equal to the fair value of Anthem Insurance at the time of the Conversion. In that regard, the Board has received written fairness opinions from the Financial Advisor, a qualified, independent financial advisor, confirming, subject to the limitations and qualifications in such opinions (which opinions will be reaffirmed to the Board as of the Effective Date), that: (i) the provision of aggregate consideration upon the extinguishing of Membership Interests under this Plan and Articles of Amendment is fair to the Eligible Statutory Members, as a group, from a financial point of view, and (ii) the total consideration to be paid to the Eligible Statutory Members under the Plan is equal to or greater than the statutory surplus of Anthem Insurance.

The Plan gave eligible members a choice in terms of how they would like to be compensated in exchange for their ownership interests.  Specifically, an eligible member could receive either cash or common stock in Anthem, Inc. (the new parent of Anthem).  If an eligible member failed to designate a preference, he or she received cash as the default option.  Nevertheless, if the IPO failed to generate sufficient cash to compensate all eligible members choosing cash, those members with the smallest interests would be compensated in cash first and, when the cash ran out, the remaining members would be compensated in stock.  Anthem ultimately eliminated the risk of running out of cash compensation by increasing the number of shares offered through the IPO.

Under the Plan, the total amount of consideration to be paid to all eligible members was to be equal in *value* to 100 million shares of the common stock of Anthem, Inc. offered through the IPO, regardless of the number of shares actually offered for sale.  The amount of consideration allocated to any given eligible member was calculated using a formula developed by consulting actuaries.  The formula had a fixed component and a variable component.  This formula was described in detail in an Actuarial Contribution Memorandum ("ACM"), which was attached as an exhibit to the Plan.  The fixed component dictated that each eligible member was assigned the value of 21 shares, regardless of the size, type, or number of policies held by that member.  The variable component dictated that additional "value shares"[3] were assigned to an

---

[3]The Court will use the term "value shares" in this entry when describing the allocation of ownership interests in the mutual company based upon the two-part actuarial contribution formula.  By referring to them as  "value shares," the Court does not intend to imply that they were actual securities that could be traded or sold through any market.  The "value shares" held value only to the extent that  the eligible member had the option of converting them either to actual shares of Anthem, Inc. or to cash following the IPO, in accordance with the terms of the Plan.

eligible member based upon a calculation accounting for the type, size, number, and duration of insurance policies held by that member.

In August 2001, prior to IDOI approval of the Plan, Anthem began sending out detailed member information packets ("MIP"), which informed members about the Plan, the required approvals, and the Board of Directors' rationale for recommending demutualization. The MIP also included a pamphlet answering anticipated questions and provided each statutory member with his or her estimated allocation of value shares, an estimate of the IPO range for the stock of Anthem, Inc. ($25 to $45 per share with $35 used for assumptive purposes), and a statement summarizing what those value shares represented to the members who wished to receive cash in lieu of stock following the IPO. The statement also described what is known as a "top-up" provision, which allowed for an automatic 10% increase in the cash payment to members choosing cash if the stock price rose rapidly after the IPO. The statement read :

> Eligible Members that are to receive consideration in the form of cash will receive a check in an amount equal to the number of shares of common stock allocated to them multiplied by the mutual public offering price of shares, or if the average closing price of Anthem, Inc. Common stock for the first 20 consecutive days of trading is greater than 110% of the mutual public offering price, an increased amount to reflect the increased value of the stock, up to an additional ten percent of the public offering price.

The MIP also spelled out the IDOI's role in approval of the Plan and the location of the related public hearing to be held on October 2, 2001. It provided a date for and description of the special membership meeting to be held for purposes of voting on the Plan, as well as instructions on how to vote by proxy. And, assuming membership approval of the Plan, a card was provided for the member to return if he preferred stock in lieu of cash. In addition to information summaries, the MIP included hundreds of pages of detail.

At the time of its August mailings to members, Anthem further indicated that the new stock company, Anthem Inc., was authorized by its founding documents to issue 900 million shares of common stock and 100 million shares of preferred stock.  In the MIP, Anthem stated it anticipated issuing no preferred shares, 76,080,000 common shares as part of the demutualization, and 28,600,000 shares for sale to the public through the IPO in order to raise capital.  It also indicated that another 100,000 shares were reserved for issuance in connection with a stock purchase plan and that the IPO underwriters held an over-allotment option to increase the IPO sale by 4,290,000 shares.

On October 1, 2001, Anthem sent a second MIP to its members, which included an updated letter signed by its Chairman and its CEO/President, as well as a summary of information outlining an additional capital raising transaction that the Board of Directors had determined would be pursued contemporaneously with the IPO.  The Plan allowed for such "Other Capital Raising Transactions" and, according to the letter, Anthem's financial advisors suggested that this additional transaction was prudent, given the unpredictability of the financial markets in the wake of September 11, 2001.  At the suggestion of its financial advisors from Goldman Sachs, which was also serving as the lead underwriter for the IPO, this mailing also pared down the expected range of the IPO offering to between $33.00 to $37.00.  Both of the MIP mailings from Anthem to its members clarified that the Board was encouraging a favorable vote on demutualization from the membership.  The mailings also pointed out that if the Plan was not approved by both the IDOI and the membership, the IPO would not go forward.  Thus, no consideration would be paid to members and Anthem would remain a mutual company.

The IDOI held the required  public hearing on the Plan on October 2, 2001.  The hearing

lasted one business day and was introduced as follows by Sally McCarty, then Commissioner of

the IDOI:

> Anthem's proposed conversion to a stock insurance company is a historic event to the insurance industry both in Indiana and across the nation. It is far and away the largest company ever to demutualize in Indiana and the fifth largest health insurance company in the country to demutualize. Perhaps most importantly, Anthem is the first health insurer in Indiana to convert from a mutual to a stock insurance company.

> Recognizing the importance of these factors and the resulting significance of this transaction for consumers in Indiana and the seven other affected states, the Indiana Department of Insurance has assembled what I consider to be the finest team of advisors available. Throughout the entire review process our advisors have insisted on strict adherence to the demutualization statute in all matters relating to Anthem's filing. They have reviewed every fact of the filing from the perspective of fairness to Anthem's enrollment. ....

> Under the Indiana demutualization law, I, as the Commissioner, must approve Anthem's Plan of Conversion to a stock insurance company if I find that the statutory requirements have been met including that the Plan of Conversion is fair, reasonable and equitable to the eligible members of the mutual insurance company.

The advisory team referred to by the Commissioner included a legal team from the law

firm of Sidley Austin Brown & Wood, an actuarial team from Arthur Anderson LLP, an

investment banking team from Fox-Pitt, Kelton, Inc., and an accounting team from

Pricewaterhouse Coopers LLP. A member from each team provided testimony during the

hearing, and similarly qualified professionals from Goldman Sachs and the actuarial consultant,

Milliman USA, were offered for questioning. IDOI officials questioned the witnesses and

members of the public submitted written questions to the witnesses. The record was kept open

for an additional ten days to obtain any further written opinions regarding fairness from both

Fox-Pitt, Kelton, Inc. and Pricewaterhouse Coopers, LLC. On October 25, 2001, Commissioner

McCarty filed her Findings of Fact, Conclusions of Law, and Order Granting Application With

Conditions.  The conditions included: (1) obtaining IDOI approval of the final details of the IPO

and the "Other Capital Raising Transaction,"[4] (2) Anthem's submission of certain tax opinions

and IRS rulings, and (3) Anthems' submission of other *pro forma* documentation.  If these

conditions were met, then the demutualization would be approved by the State.

      The small number of returned election cards from the eligible members indicated a high

preference for receiving cash, while market research on the IPO indicated high interest in the

stock of the new company on the part of institutional investors.  In fact, promised orders from

those who had been approached during the marketing efforts indicated a demand of ten or more

times the 28.6 million shares planned for the IPO.  On October 26, 2011, Anthem filed an

amendment to its securities registration statement with the Security Exchange Commission,

increasing the size of its public offering to 40 million shares.  According to Anthem's CEO,

Larry Glasscock, the decision to increase the size of the public offering was intended to ensure

that it had more cash to distribute to members who opted for cash.

      Five members of Anthem's Board who were not employed by Anthem served as a

"pricing committee" tasked with setting the final price of the IPO.  The pricing committee met

with Anthem advisors, IDOI advisors, and the full Board of Directors leading up to the special

membership meeting on October 29, 2001.  At that meeting, 95% of members voted to approve

the demutualization and adopt the Plan.  Later that day, after further meetings between the

pricing committee and its advisors from lead underwriter Goldman Sachs, Anthem filed a

prospectus with the SEC identifying the offering price of the IPO as $36.00 per share and further

---

[4]The final details specifically included the IPO price and the amount of shares to be sold, which according to both Anthem's and IDOI's experts, could not be determined at the time of the hearing because of changing market conditions.

increasing the size of the IPO to 48 million shares, with an additional 7.2 million shares allotted as an option to the IPO underwriters.  This resulted in an aggregate sale of 55,200,000 shares, if the underwriters exercised their option in full.

The IPO ultimately resulted in the sale of 55.2 million shares of Anthem, Inc. at $36 per share.  In addition to the 55.2 million shares sold, Anthem issued approximately 48.1 million shares to its members who had requested stock, the majority of whom would be included in the class Jorling proposes for certification in this lawsuit.  Shares in Anthem's parent stock began trading on the stock market on October 30, 2001 and closed that day at $40.90 per share.  The Plan became effective November 2, 2001, upon the Indiana Secretary of State's approval of the appropriate amendments to the insurance companies' Articles of Incorporation (which the membership had previously approved at the special meeting) and Anthem, Inc. stock closed that day at $42.90 per share.  Because of the 10% "top-up" provision and the prompt increase in market price for the stock, members of the mutual company who elected to receive cash received $39.60 per share of value assigned to them.

## B. Prior Rulings in *Ormond*

The *Ormond*  lawsuit was initially filed in August 2005, as a class-action in the United States District Court for the Northern District of Ohio, on behalf of those former mutual members who received cash in exchange for their interests.  The lawsuit asserted that the actions of Anthem and its new parent company, Anthem, Inc., as well as the actions of lead underwriter and financial advisor, Goldman Sachs, resulted in the IPO shares being severely undervalued. The case was transferred to this Court in December 2005, prior to a ruling on class certification.

Before his elevation to the Seventh Circuit Court of Appeals, Judge Hamilton completed

a great deal of the heavy lifting in *Ormond*, including the certification of a class and the

dismissal of Goldman Sachs as a defendant.  Specifically, the *Ormond* class consists of:

> All former members of Anthem Insurance residing in Ohio, Indiana, Kentucky
> and Connecticut who received cash compensation in connection with the
> demutualization of Anthem Insurance on November 2, 2001, and the communities
> comprised of them and their spouses, if any, excluding:
>
> > (i) all employers located in Ohio and Connecticut that maintained Anthem
> > group health insurance policies on their respective employees and retirees
> > and that received demutualization compensation (the "Grandfathered
> > Groups");
> > (ii) Defendants, their predecessors and successors in interest;
> > (iii) the officers and directors of Defendants, their predecessors and
> > successors;
> > (iv) counsel of record in this action and their respective parents, spouses
> > and children; and
> > (v) judicial officers who enter an order in this action, and their respective
> > parents, spouses and children.

The class in *Ormond* pursued both tort and breach of contract theories against Anthem.

On July 1, 2011, this Court entered its order granting in part and denying in part Anthem's

summary judgment motion.  In doing so, this Court discussed the demutualization process at

length and analyzed the limited case law defining the duties inherent in that process.  From there,

the Court determined that a tort claim could be brought against Anthem under Indiana law

because, as a mutual company, Anthem owed a duty to its equity owners – a duty that was

separate and distinct from the contractual duty Anthem owed those same policyholders in their

role as insureds.  In making this ruling, the Court explained:

> Plaintiffs assert two tort counts in their Fourth Amended Complaint – a breach of
> fiduciary duty claim and a negligence claim.  The Court sees no need for separate
> treatment here, as the key to any tort recovery is to define as a matter of law the
> duty, if any, imposed by Indiana law on the Defendants.  To that end, the Court
> finds that Indiana would impose a duty on Anthem to act in good faith and with
> reasonable care in obtaining approval of its conversion plan and in executing that
> plan following IDOI's conditional approval.  For purposes of this lawsuit, the

-12-

> inquiry is whether the company exercised such care in pricing and sizing the IPO. If Anthem's Board or pricing committee failed to act with the care that an ordinarily prudent person in a like position would exercise in pricing and sizing the IPO, the corporation itself can be held liable. This is consistent with the obligations Indiana law places on individual corporate directors. See Ind. Code § 23-1-35-1. Under the circumstances, the Court believes that these obligations would apply to the corporation.

*Ormond v. Anthem,* 1:05-cv-1908-TWP-TAB, [Dkt. 446 at 46-47].

In addition, the Court rejected Anthem's preemption defense premised upon the Employee Retirement Income Security Act ("ERISA") and its defense grounded in the economic loss doctrine. Finally, the Court found that Anthem was entitled to summary judgment on all of the plaintiffs' breach of contract claims.

## II. LEGAL STANDARD

A variety of motions are currently pending before the Court in this feverishly litigated case. Most notably, Defendants seek summary judgment for numerous reasons. Jorling, for his part, seeks to add a named class representative and asks the Court to revisit the issue of class certification. Because the Court finds Defendants' preemption-based summary judgment argument dispositive, all class certification issues are rendered academic. Accordingly, the Court will limit its analysis to Defendants' motion for summary judgment.

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir.2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences

in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir.2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir.2001) (citation and internal quotations omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc*., 129 F.3d 391, 395 (7th Cir.1997) (citations and internal quotations omitted).

### III. DISCUSSION

**A.    A brief primer on federal securities laws**

To fully understand Defendants' preemption argument, a brief review of some federal securities legislation is instructive.  In 1995, Congress passed the Private Securities Litigation Reform Act ("PSLRA"), which was designed to curb baseless securities lawsuits.  By enacting PSLRA, Congress was primarily concerned with "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and manipulation by class action lawyers of the clients whom they purportedly represent." *Demings v. Nationwide Life Ins. Co.*, 593 F.3d 486, 490-91 (6th Cir. 2010) (citations and internal quotations omitted).   Prior to the PSLRA, plaintiffs could survive a motion to dismiss based on relatively barebones allegations, thus forcing defendants to

endure a protracted, costly, and asymmetrical[5] discovery process.  Congress has stated

"discovery costs account for roughly 80% of total litigation costs in securities fraud cases." H.R.

Conf. Rep. No. 104-369, at 31 (1995) (internal quotations omitted).  Facing astronomical legal

fees, not to mention the general uncertainty of high-stakes litigation, defendants often decided

that the only rational route was to settle, even if plaintiffs had a weak (or meritless) case.  Given

this backdrop, Congress passed the PSLRA, which, among other things, heightened pleading

requirements, making it more difficult for plaintiffs to survive a motion to dismiss, and thus

receive the keys to unlock the discovery process. *See* John F. Olsen et al., *Pleading Reform,*

*Plaintiff Qualification and Discovery Stays Under the Reform Act*, 51 Bus. Law. 1101 (1996);

*Sofonia v. Principal Life Ins. Co.*, 378 F. Supp. 2d 1124, 1127 (S.D. Iowa 2005).

But the PSLRA was not a panacea.  Predictably, it drove many would-be plaintiffs to file

their claims in state court, based on state law.  To block this end-run around the PSLRA,

Congress passed the Securities Litigation Uniform Standards Act ("SLUSA") in 1998. *See* H.R.

Conf. Rep. No. 105-803 (Oct. 9, 1998).  In pertinent part, SLUSA forbids the bringing of a class

action in any state or federal court if the action is "based upon the statutory or common law of

any State" and the plaintiff alleges that, in connection with the "purchase or sale" of a nationally

traded security a defendant made an "untrue statement or omission of fact" or "employed a

---

[5]The discovery process in securities cases has often been described as "asymmetrical" because the defendant has a large universe of documents that are of interest to the plaintiff, whereas the plaintiff has relatively few documents of interest to the defendant.  Therefore, the plaintiff has the incentive to pry into every imaginable crevice of the defendant's records, thus forcing the defendant to incur substantial costs or settle.  By contrast, if two similarly sized entities are litigating, the discovery process is more reciprocal, meaning parties have the incentive to reach reasonable agreements on the scope of discovery.  In other words, if they don't live by the Golden Rule – "Do unto others as you would have them do unto you" – they could both face onerous discovery costs.

manipulative or deceptive device or contrivance." 15 U.S.C. § 77p(b); 15 U.S.C. § 78bb(f)(2).

SLUSA's expansive language is construed broadly in order to prevent frustration of the

PSLRA's objectives. *Brown v. Calamos,* 777 F. Supp. 2d 1128, 1131 (N.D.Ill. 2011), *aff'd,* –

F.3d – , 2011 WL 5505375 (7th Cir. Nov. 10, 2011).

But SLUSA does not apply to every class action involving securities. Specifically,

SLUSA provides an exemption from this prohibition against state law-based class actions,

commonly referred to as the "Delaware Carve-Out."[6]  The carve-out allows an otherwise

preempted state law class action to be pursued if the claim involves a purchase or sale of

securities by an issuer to "holders of equity securities of the issuer" or if the action involves a

recommendation or communication from the issuer to "holders of equity securities of the issuer"

with respect to voting their shares or related to a tender or exchange offer.  15 U.S.C.

§77p(d)(1)(B); 15 U.S.C. § 78bb(f)(3).

**B.     Case law addressing the applicability of SLUSA in the context of demutualizations**

Anthem argues that SLUSA preempts Plaintiff from bringing this class action and

requires that it be dismissed.  Not surprisingly, Jorling argues that SLUSA doesn't apply because

the complaint is bereft of allegations pertaining to omissions or untrue statements. Alternatively,

Jorling argues that even if SLUSA applies, the Delaware Carve-Out defeats Anthem's argument.

Not surprisingly, on-point case law (addressing the application of SLUSA in the context

class actions stemming from demutualizations where policyholders received securities in

---

[6]The phrase "Delaware carve-out" comes from a 1998 Delaware case where the court described the provisions of 15 U.S.C. § 78bb as being particularly applicable to Delaware law and thus described them as "Delaware carve-outs." *See Malone v. Brincat*, 722 A.2d 5, 13 (Del.1998).

exchange for their ownership interests) is relatively scant.  Fortunately, though, the Court is not swimming in entirely uncharted waters: courts have addressed this issue on at least two occasions.  And, here, each side has latched onto one case to bolster its position.  Specifically, Anthem relies heavily on a decision from the Eighth Circuit, affirming the district court's dismissal of a class action asserting state law claims of fraud, breach of fiduciary duty, and unjust enrichment arising out of the demutualization of Principal Life Insurance Company. *Sofonia v. Principal Life Ins. Co.*, 465 F.3d 873 (8th Cir. 2006).  Meanwhile, Jorling contends that if SLUSA applies, a decision by the District Court for the Eastern District of New York provides a compelling analysis of why the Delaware Carve-Out applies. *In re MetLife Demutualization Litigation*, 2006 WL 2524196 (E.D.N.Y. Aug. 28, 2006).  A review of each case is instructive.

Judge Robert W. Pratt of the Southern District of Iowa appears to be the first jurist to delve into SLUSA's application in a circumstance where former mutual policyholders have brought a class action asserting that, as a result of the deceptive acts of the insurer and its affiliates during the demutualization process, they received less value (fewer shares of the new publicly traded company) than their mutual interests were actually worth. *Sofonia v. Principal Life Ins. Co.*, 378 F. Supp. 2d 1124 (S.D. Iowa 2005).  In *Sofonia*, plaintiffs were a group of life insurance policyholders who made up a settlement class from an earlier class action (the "*Grove* class action*"), which asserted deceptive sales practice. *Id*. at 1126.  A court approved settlement was reached in the *Grove* class action. *Id.*  Donald Sofonia was a member of the *Grove* settlement class and the named plaintiff who brought the new class action in state court based upon state law, asserting deception in connection with the demutualization.  The Defendants

-17-

removed the case to the U.S. District Court for the Southern District of Iowa, asserting SLUSA

preemption, and moved the district court for dismissal.

Judge Robert Pratt described the nature of the litigation as follows:

In October 2001, Principal Mutual (and consequently Principal Life) went through the process of demutualization, whereby it converted from a mutual insurance holding company structure to a publicly traded stockholder-owned corporate structure. As part of the demutualization, Principal Mutual, along with several other entities, merged into Principal Financial Services ("Principal Financial"), a wholly owned subsidiary of Principal Financial Group ("PFG"). Once the demutualization plan was approved by Principal Mutual's Board of Directors, it was submitted to the members of Principal Mutual (the policyholders of Principal Life) for approval.  Eligible policyholders, including Plaintiff, were mailed notice packages consisting of a two-part Policyholder Information Booklet explaining the demutualization, a proxy card for voting on the plan, and other materials. Principal Mutual members approved the Plan, as did the Iowa Commissioner of Insurance.  The demutualization plan became effective on October 26, 2001, and provided that Principal Mutual's members, the putative Plaintiff class here, would receive publicly traded common stock in PFG in exchange for their "Membership Interests" in Principal Mutual. Plaintiff's Amended Complaint alleges that Defendants fraudulently implemented the demutualization scheme only to shift the economic costs it incurred in the *Grove* litigation back onto the *Grove* class members. More specifically, Plaintiff claims that deceptive statements in the Policyholder Information Booklet caused policyholders to vote in favor of the demutualization and, as a result, the *Grove* class members received smaller amounts of PFG stock than they would have absent Defendants' misconduct.

*Id*. at 1126-27.

The court dismissed the new class action, finding that SLUSA applied because the

securities issued to the purported class were listed on the New York Stock Exchange and were

therefore "covered securities."  Moreover, the alleged wrongful conduct occurred "in connection

with" the "purchase or sale" of the covered security.  *Id.* at 1128-31.  The court then rejected

Sofonia's Delaware Carve-Out defense, finding that the carve-out, in unmistakable terms, only

"exempts claims arising from an offering of a company's securities *to its existing equity security*

holders." *Id.* at 1133 (citing 15 U.S.C. §§ 77p(d)(1)(A), 78bb(f)(3)(a)(I)) (emphasis in original)). Since the purported class members had held only membership interests, they were not *existing equity security holders*. *Id.* at 1134.

On appeal, Sofonia  dropped the Delaware Carve-Out argument, but challenged the district court's findings that the demutualization involved "covered securities" instead of insurance products and that his complaint alleged misrepresentations or omissions of material facts "'in connection with the purchase or sale' of a covered security." *Sofonia*, 465 F.3d at 877. Mr. Sofonia maintained that the involvement of a security was incidental and the essence of the complaint was that, through a corporate reorganization, the defendants were recapturing the costs of the *Grove* settlement. *Id.* at 879.

The Eighth Circuit rejected each of Sofonia's arguments and affirmed the district court's dismissal.  The appellate court found that although the mutual interests given up by the plaintiff class were not "covered securities" under SLUSA's definition, the stock they received clearly was.  *Id.* at 877.  Further, the court noted that the demutualization was more than a mere internal restructuring. *Id.* at 879.  Finally, the court determined Sofonia's claim that the defendants had made false or deceptive statements in the information packet provided to the policyholders was an integral step in the exchange of mutual interests for stock and therefore the class action satisfied the "in connection with" requirement for SLUSA preemption. *Id.* at 879-80.

The district court's decision in *In re MetLife Demutualization Litigation*, 2006 WL 2524196 (E.D.N.Y. Aug. 28, 2006) was not put to the appellate test.  Plaintiffs in *MetLife* were policyholders who received shares of MetLife, Inc. as compensation for their interests in MetLife Co., as part of its demutualization.  *Id.* at *1-2.  They pursued a claim in federal court

based upon federal securities laws and sought to enjoin a class action filed by other similar policyholders in New York state court based on state law.  *Id*. *2.  Both the federal court plaintiffs and the purported class of plaintiffs in the state court action claimed that MetLife, Inc. issued an excess supply of shares in its IPO, thereby depressing the stock price and causing them to receive inadequate consideration. *Id*.  They also claimed that the information packages provided to policyholders, in connection with the company's recommendation for approval of the demutualization, misled them with untrue statements and omitted material facts.  *Id*. at *1.

The court described MetLife Co.'s demutualization process as "convoluted."  *Id.* at *1, n.1.  It was structured as follows:

> The process of demutualization occurred in a number of stages.  First, MetLife Co. policyholders' interests were extinguished.  Second, all Eligible Policyholders received in return for their policies, consideration in the form of shares of MetLife Co. common stock-with 100% of MetLife Co. common stock (about 700 millions shares) allocated to the Eligible Policyholders.  Third, the former policyholders exchanged their shares of MetLife Co. common stock for cash, policy credits, or beneficial interests in the MetLife Policyholder Trust (the "Trust").  The Trust held shares of stock in the newly formed holding company, MetLife, Inc.

*Id*. at *1 (citations to the record omitted).

The federal court plaintiffs sought an injunction on the basis of SLUSA.  *Id*. at *3.  The parties essentially agreed that the state court action was a "covered action" under SLUSA, but the state court plaintiffs argued that their lawsuit was exempted by the Delaware Carve-Out.  *Id*. *4.  The district court agreed.  *Id*. at *6-7.  Importantly, though, the district court's decision was tied to a step taken in the MetLife demutualization process that was not taken in the Principal demutualization (or in this case).  Specifically, the structure of the MetLife demutualization included a step where policyholders were given common stock in MetLife Co., which in turn was traded for either cash, policy credits, or shares of the trust holding the stock of MetLife,

Inc.(the entity that was being accused of issuing too many shares in an effort to depress its IPO

price).  *Id*. at *1.  This extra step allowed the court to find that, unlike the plaintiffs in *Sofonia,*

the plaintiffs in the New York state court class action were actually "holders of  equity

securities" as that phrase is used in the Delaware Carve-Out and the exchange of those securities

for their trust interests qualified as a "purchase ... of securities by the ... affiliate of the issuer

exclusively from ... holders of equity securities of the issuer." *Id*. at 6 (citing to quoted language

from 15 U.S.C. § 78bb(f)(3)(A)(ii)(I)).  In other words, for purposes of the carve-out, the

purchase of the MetLife Co. common stock from the plaintiffs was the transaction at issue.  The

court also found that, alternatively, the Delaware Carve-Out would apply because the vote for

the demutualization did not occur until after the policyholders had obtained their shares of

MetLife Co., thereby making the recommendations included in the information packages sent to

policyholders an ongoing recommendation to "holders of equity interests" with respect to voting

their securities.  *Id*. at 7 (citing 15 U.S.C. § 78bb(f)(3)(A)(ii)(II)).

**C.     Does SLUSA apply? If so, does the Delaware Carve-Out apply?**

In the case at bar, Mr. Jorling first argues against the application of SLUSA because he

has not pled an omission of fact or untrue statement on the part of Defendants.  Authority from

the Sixth Circuit, buttressed in many respects by the language of a recent Seventh Circuit

decision, teaches that when assessing the application of SLUSA, the analysis must focus on the

*substantive concepts* inherent in the complaint's allegations – not merely the words used. *Segal*

*v. Fifth Third Bank N.A.,* 581 F.3d 305 (6th Cir. 2009); *see also*, *Brown v. Calamos*,  __F.3d __,

2011 WL 5505375 at *5 (7th Cir. Nov. 10, 2011).  Obviously, a contrary rule would exalt artful

pleading over substance.

In *Segal*, the plaintiffs alleged breach of fiduciary duty, unjust enrichment, and breach of contract in connection with defendant Fifth Third Bank's decision, as a trustee of trusts to which plaintiffs were beneficiaries, to purchase certain mutual fund shares. *Segal,* 581 F.3d at 308. The plaintiffs included a disclaimer in their amended complaint stating: "None of the causes of action stated herein are based upon any misrepresentation or failure to disclose material facts to plaintiff ...." *Id.* at 310. Invoking SLUSA, the district court dismissed the class action and the Sixth Circuit affirmed, stating that it is the substance of the complaint that matters as opposed to any "magic words." *Id.* Artful pleading cannot be used to frustrate the purposes of PSLRA and SLUSA. *Id.* at 311.

Most recently, the Seventh Circuit reviewed a SLUSA-based dismissal from the Northern District of Illinois. *Brown v. Calamos*, ___F.3d ___, 2011 WL 5505375 (7th Cir. Nov. 10, 2011). Although the factual backdrop in *Brown* is not particularly similar to the present circumstances, the broad principles discussed by the Seventh Circuit are applicable. Specifically, in affirming the dismissal, the Seventh Circuit made clear that when determining if SLUSA applies, courts must go beyond the superficial words used in the complaint. *Id.* at *5. After examining the varied approaches taken by three other circuits when reviewing claims for potential SLUSA preemption, *see Stoody-Broser v. Bank of America,* (9th Cir. June 6, 2011); *Atkinson v. Morgan Asset Management, Inc.*, 658 F.3d 549, 554-555 (6th Cir. 2011); *LaSala v. Bordier et Cie*, 519 F.3d 121, 141 (3d Cir.2008), Judge Posner applied a hybrid standard, determining that:

> The plaintiff in the present case must lose even under a looser approach than the Sixth Circuit's (not the Ninth Circuit's approach, however, but one close to the Third Circuit's), whereby *suit is barred by SLUSA only if the allegations of the complaint make it likely that an issue of fraud will arise in the course of the litigation* - as in this case. The allegation of fraud would be difficult and maybe impossible to disentangle from the charge of breach of the duty of loyalty that the

defendants owed their investors.

*Brown v. Calamos*,  2011 WL 5505375 at *5 (emphasis added).

Jorling is relying on an alleged failure to disclose key information in connection with the IPO as proof of Anthem's deceit and breach of tort or contract duties.  As was the case in *Brown*, it would be impossible to "disentangle" the securities fraud issue from the state law claims involving fiduciary failure and breach of contract.  Jorling's own recitation of material facts in opposing summary judgment contains several references to Anthem's failure to disclose vital facts. [Dkt. 192 at 7-9].  Moreover, in the *Ormond* complaint, the same counsel first identified and drafted nearly identical claims on behalf of the mutual members who took cash instead of stock.  Tellingly, in that pleading, the plaintiffs appear to be much more forthcoming with their allegations of failure to disclose or fraud or both.  For instance, in *Ormond* the plaintiffs expressly stated that Anthem "disingenuously assumed," "continued falsely to depict," " misrepresented the facts," "made no disclosure, " and "did not disclose" [*See Ormond* Dkt. 122 at 26, 28 , 35, 83].  In the Court's view, allowing Jorling's class action complaint to survive SLUSA because he carefully blotted out certain allegations would undermine federal securities law.

Jorling also argues that SLUSA does not apply where the state law claim is a "genuine" breach of a contract; therefore, his breach of contract claims should survive a SLUSA challenge. This is a "form over substance" argument, which has been routinely rejected by the courts. *Segal v. Fifth Third Bank N.A.,* 581 F.3d 305; *Rowinski v. Salomon Smith Barney, Inc.,* 398 F.3d 294, 300 (3d Cir. 2005); *Miller v. Nationwide Life Ins. Co.,* 391 F.3d 698, 702 (5th Cir. 2004); *Brown v. Calamos,* 777 F. Supp. 2d 1128, 1131 (N.D. Ill. 2011), *aff'd,* __F.3d __ , 2011 WL

5505375 (7th Cir. Nov. 10, 2011).

Moreover, as Jorling's counsel acknowledged at oral argument, if this Court is to remain consistent with its rulings in *Ormond*, Jorling's breach of contract claims (including those premised on third-party beneficiary status) are doomed to fail. To reiterate, the Court rejected the *Ormond* plaintiffs' breach of contract claims and the only claim allowed to proceed past summary judgment in *Ormond* was the breach of fiduciary duty tort claim made in connection with the plaintiffs' share dilution theory. For the same reasons explained in the Court's summary judgment order in *Ormond* [*See Ormond* Dkt. 446], the breach of contract theories at issue here must suffer the same fate.[7]

Jorling's final effort at defeating SLUSA preemption is the invocation of the Delaware Carve-Out. This Court rejects the application of the carve-out for the same reason that it was rejected by Judge Robert Pratt at the district court level in *Sofonia*. Jorling and his proposed class were not "holders of equity securities." *Sofonia v. Principal Life Ins. Co.*, 378 F. Supp. 2d at 1133. In his response brief, Plaintiff attempts to muddy the waters by arguing that his circumstances are akin to the plaintiffs in *Metlife*. But this argument is unavailing. Simply stated, Jorling, unlike the plaintiffs in *MetLife*, was not a holder of the issuer's equity securities.

---

[7]Plaintiff attempted to assert a breach of contract claim anchored in Section 12.9 of the Plan during the oral arguments held on September 9, 2011. Nonetheless, such eleventh hour claims – asserted after the summary judgment briefing – are procedurally improper. Accordingly, the Court will not meaningfully consider this new argument. *See* L.R. 7.5(a) ("An oral argument shall be confined to argument and shall not include the presentation of additional evidence."); *see also Ceta v. Mukasey*, 535 F.3d 639, 649 (7th Cir. 2008) ("Under well-established principles of appellate procedure, we shall not consider arguments raised for the first time at oral argument; the Government therefore has forfeited this submission."). And, as a practical matter, even if the Court considered it, this argument would not be a game-changer. Incidentally, the Court is **GRANTING** Defendants' Motion for Leave to File Supplemental Brief in Support of Motion for Summary Judgment (Dkt. 220).

Anthem's demutualization did not contain an extra step – where securities were traded for cash, policy credit, or other shares – like the demutualization in *Metlife*. Because the Delaware Carve-Out does not apply, SLUSA preempts and bars Jorling's claims. Defendants make other arguments in favor of summary judgment. Given the dispositive nature of the SLUSA argument, however, the Court need not address them.

## IV. CONCLUSION

For the reasons set forth in this entry, Defendants' Motion For Summary Judgment (Dkt. 138) is **GRANTED**; Defendants' Motion for Leave to File Supplemental Brief in Support of Motion for Summary Judgment (Dkt. 220) is **GRANTED**; and Plaintiff's Motion for Partial Summary Judgment is **DENIED**. All other pending motions (which relate to class certification, discovery issues, and oral arguments) – Dkt. 132, Dkt. 134, Dkt. 167, and Dkt. 217 – are **DENIED AS MOOT**. A final judgment will accompany this entry.

SO ORDERED.

Date: 12/23/2011

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution attached.

-25-

Distribution to:

Matthew Thomas Albaugh
BAKER & DANIELS - Indianapolis
matthew.albaugh@bakerd.com

Dennis Paul Barron
dennispbarron@aol.com

Michael F. Becker
THE BECKER LAW FIRM CO., L.P.A.
mbecker@beckerlawlpa.com

Peter R. Bisio
HOGAN LOVELLS US LLP
peter.bisio@hoganlovells.com

Todd S Collins
BERGER & MONTAGUE, P.C.
tcollins@bm.net

T. David Copley
KELLER ROHRBACK, L.L.P.
dcopley@kellerrohrback.com

Edward O'Donnell DeLaney
DELANEY & DELANEY LLC
ed@delaneylaw.net

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

Thomas M. Fisher
INDIANA OFFICE OF THE ATTORNEY
GENERAL
tom.fisher@atg.in.gov

Craig A. Hoover
HOGAN LOVELLS US LLP
cahoover@hhlaw.com

Peter R. Kahana
BERGER & MONTAGUE, P.C.
pkahana@bm.net

Kevin M. Kimmerling
BAKER & DANIELS - Indianapolis
kevin.kimmerling@bakerd.com

Cari C. Laufenberg
KELLER ROHRBACK L.L.P.
claufenberg@kellerrohrback.com

Adam K. Levin
HOGAN LOVELLS US LLP
adam.levin@hoganlovells.com

Neil F Mara
BERGER & MONTAGUE, P.C.
nmara@bm.net

H. Laddie Montague Jr
BERGER & MONTAGUE P.C.
hlmontague@bm.net

Anne Kramer Ricchiuto
BAKER & DANIELS - Indianapolis
anne.ricchiuto@bakerd.com

Lynn L. Sarko
KELLER ROHRBACK, L.L.P.
lsarko@kellerrohrback.com

Christopher G. Scanlon
BAKER & DANIELS - Indianapolis
chris.scanlon@bakerd.com

Paul A. Wolfla
BAKER & DANIELS - Indianapolis
paul.wolfla@bakerd.com

Eric Hyman Zagrans
eric@zagrans.com